JOYCE LILLIAN POPE *v.* STATE
OF MARYLAND

[No. 11, September Term, 1978.]

*Decided January 19, 1979.*

310

*George E. Burns, Jr., Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *Geraldine Kenney Sweeney, Assistant Public Defender,* on the brief, for appellant.

*Deborah K. Handel, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court. ELDRIDGE, J., filed an opinion concurring in part and dissenting in part at page 354 *infra.*

Joyce Lillian Pope was found guilty by the court in the Circuit Court for Montgomery County under the 3rd and 5th

counts of a nine count indictment, no. 18666. The 3rd count charged child abuse, presenting that "on or about April 11, 1976, . . . while having the temporary care, custody and responsibility for the supervision of Demiko Lee Norris, a minor child under the age of eighteen years [she] did unlawfully and feloniously cause abuse of said minor child in violation of Article 27, Section 35A of the Annotated Code of Maryland. . . ." The 5th count charged misprision of felony under the common law, alleging that on the same date she "did unlawfully and wilfully conceal and fail to disclose a felony to wit: the murder of Demiko Lee Norris committed by Melissa Vera Norris on April 11, 1976, having actual knowledge of the commission of the felony and the identity of the felon, with the intent to obstruct and hinder the due course of justice and to cause the felon to escape unpunished. . . ." [1]

On direct appeal the Court of Special Appeals reversed the judgment entered on the child abuse conviction and affirmed the judgment entered on the misprision of felony conviction.[2] *Pope v. State,* 38 Md. App. 520, 382 A. 2d 880 (1978). We granted Pope's petition and the State's cross-petition for a writ of certiorari. We affirm the judgment of the Court of Special Appeals with respect to the 3rd count, child abuse. We reverse the judgment of the Court of Special Appeals with

---

1. The remaining seven counts of the indictment, each concerning offenses committed on or about 11 April 1976 concerning or related to the minor child, alleged murder in the second degree — 1st count; manslaughter — 2nd count; accessory after the fact, murder — 4th count; obstruction of justice — 6th count; conspiracy to obstruct justice — 7th count; assault and battery — 8th count; assault — 9th count. Before trial, the court granted Pope's motion to dismiss the 4th count. At the close of evidence offered by the State, the court granted Pope's motions for judgment of acquittal as to the 6th and 7th counts. At the close of all the evidence, the court reserved ruling on Pope's motions for judgment of acquittal on the remaining counts. It found her "sane" and not guilty on the 1st and 2nd counts, and "sane" and guilty on the 3rd and 5th counts. It held that the 8th and 9th counts merged with the 3rd count.

Pope was also charged in indictment no. 17830 with murder in the first degree. This indictment was nol prossed before trial.

2. The trial court sentenced Pope to the Department of Corrections for a period of seven years on each of the convictions under the 3rd and 5th counts, the sentences to run concurrently. It suspended all but eighteen months of the sentence and recommended that it be served in the Montgomery County Detention Center. Upon release, Pope was to be placed on supervised probation for two years upon condition that she "seek and take psychiatric or psychological assistance."

respect to the 5th count, misprision of felony. We remand to that court with direction to remand to the Circuit Court for Montgomery County for the entry of a judgment of acquittal on the third count and dismissal of the fifth count.

## ISSUES FOR DECISION

I. The sufficiency of the evidence to sustain the conviction of Pope of the crime of child abuse as (1) a principal in the first degree, or (2) a principal in the second degree.

II. The status in Maryland of the crime of misprision of felony.

## THE EVIDENCE

The evidence adduced at the trial [3] established that Demiko Lee Norris, three months old, died as a result of physical injuries inflicted by his mother, Melissa Vera Norris.[4] The abuse by the mother occurred over a period of several hours on a Sunday morning at Pope's home and in Pope's presence. Pope's involvement in the events leading to the child's abuse and death began on the preceding Friday evening when she and Melissa, with the child, were driven home by Pope's sister, Angela Lancaster, from a service held at the Christian Tabernacle Church. When they arrived at Melissa's grandparents' home, where Melissa was living, Melissa refused to enter the house, claiming that it was on fire, although in fact it was not. During the evening, Melissa had sporadically indicated mental distress. "She would at times seem caught up in a religious frenzy with a wild look about

---

3. The evidence at the trial consisted primarily of two extra-judicial statements given by Pope to the police, one written by her and the other tape recorded, and her testimony at trial, which was essentially repetitious of the statements. Pope's brief contains an agreed statement of facts pursuant to Maryland Rule 828 g. A summary of the evidence is given in the opinion of the Court of Special Appeals. Pope v. State, 38 Md. App. 520, 530-536, 382 A. 2d 880 (1978).

4. The mother, charged and tried separately from Pope, was found to be not responsible for her criminal conduct at the time of the commission of the offense, and, therefore, not guilty by reason of insanity. Maryland Code (1957, 1972 Repl. Vol.) Art. 59, § 25 (a).

her, trying to preach and declaring that she was God. She would as quickly resume her normal self without ever seeming to notice her personality transitions." *Pope,* 38 Md. App. at 531. Pope agreed to take Melissa and the child into her home for the night because she did not want to put them "out on the street," and Angela would not let them stay in her home. Melissa had no money and Pope and Angela bought food and diapers for the baby. That evening Pope cleaned and dried the baby and inquired of Melissa about a bad rash he had. Melissa slept in Pope's bedroom. Pope kept the baby with her in the living room, telling Melissa: "[Y]ou can go to sleep ... I'll be up, I'll just stay up, I'll watch the baby. . . ." She explained in her testimony: "And I don't know why it was just, just a funny feeling that I had, you know, and ever since the baby was there I just kept it close to me for some reason." Pope fed the baby and fixed a bed for it in a dresser drawer. She stayed with the baby to care for him during the night because he was spitting up. She could not sleep while Melissa was there.

The next morning, awakened by the crying of the child, Pope fed him! Throughout the day Melissa "changed back and forth." When Melissa was "herself" she took care of her child. When Melissa thought she was God, Pope undertook the maternal duties. Pope watched the child "like it was my own," because "I felt maybe [Melissa] could [hurt the child] when she confessed she was God. . . . I felt close to the baby, maybe because, you know, I felt I haven't had a baby for so long, you know, I enjoyed taking care of the baby and watching it." At a baby shower Saturday evening at the home of Pope's mother, Melissa again reverted to being God, looking wild, speaking loudly, preaching and giving orders. Melissa and the baby returned to Pope's home. Melissa put the child in bed with her, but Pope thought it better that the child not remain there. She was afraid Melissa would roll over and "smother it to death." She told Melissa: "I'll just take the baby in [the living room] . . . I'll watch it, I'll get up and feed it . . . I don't mind." The next morning, Sunday, at about 4:30 o'clock, Pope prepared the baby's bottle and fed him. When Melissa got up, Pope suggested that she go back to bed. Melissa behaved

normally for awhile. Then her "episodes of 'changing to God' became more pronounced. She stomped and gestured as she strode back and forth, putting crosses on doors and demanding the departure of the evil which she claimed to see. She kicked and banged at the door of [Pope's] son, and fearful that by breaking in Melissa would frighten him, [Pope] unfastened the door to permit entry. Loudly exhorting Satan to leave the premises, Melissa 'anointed' [Pope's] son with oil, placing some of the oil in the child's mouth. She subsequently repeated the process with [Pope's] daughter. When dressed, [Pope's] children left the house expeditiously, lingering only long enough to embrace their mother." *Pope,* 38 Md. App. at 531.

During a lucid period, Melissa prepared to go to church. She got a tub of water to bathe the baby. What next occurred is graphically described in the opinion of the Court of Special Appeals:

> "Then, from her suddenly changed voice and appearance, [Pope] knew Melissa had changed again to 'God.' Calling out that Satan had hidden in the body of her son, Melissa began to verbally exorcise that spirit and physically abuse the child by punching and poking him repeatedly about the stomach, chest and privates. After she undressed the child, that which ensued was hardly describable. In her religious frenzy of apparent exorcism, Melissa poked the child's vitals and beat the child about the head. She reached her fingers down its throat, wiping mucus and blood on diapers at hand, and even lifted the child by inserting her hands in its mouth, and shook him like a rag." *Id.*

Continuing to talk and stomp, Melissa began to squeeze the baby. Then, holding the child by the neck with one hand, she took him into the bathroom, acting like she did not know that Pope was present. When she first started this abuse, Melissa, in her "God voice," called Pope and asked her: "Didn't I give you eyes to see?" Pope noticed that Melissa's finger nails were "real long," and she said to Melissa: "[H]ow do you

handle a baby with such long nails," but Pope did nothing. She admitted that she knew at some point that Melissa was hurting the baby and was "fearful, amazed and shocked at the 'unbelievable' and 'horrible' thing that was happening."

Melissa's frenzy diminished. Angela came to the house to take them to church. Pope did not tell Angela what happened — "I could not get it out." Angela asked her what was wrong, and Pope said: "[I]t's Melissa, the baby. . . ." She locked the door at Angela's direction so Angela's children would stay in the yard with Pope's children. Angela wrapped the child in a towel, raised him over her head and prayed.

Pope, Melissa and Angela left with the child to go to church. At Melissa's request they stopped by her grandfather's house, arriving about 2:00 p.m. Pope told him the child was dead, but he did not believe her because all three were acting so strangely. He refused to take or look at the baby. The three women with the child went to Bel Pre Health Center, picked up another member of the Christian Tabernacle congregation, telling her that "God has a job for you to do," and proceeded to the church. En route, they passed several hospitals, police stations and rescue squads. At the church, the child was given to, or taken by the Reverend Leon Hart, who handed him to Mother Dorothy King for her prayers. She discovered that the baby's body was cool and sent for ambulance assistance. Police and rescue personnel arrived and determined that the child was dead. There was expert medical testimony that the child had died sometime during the period of fifteen minutes to several hours after it was injured. The medical expert expressed no opinion as to whether the child could have been successfully treated if the injury had been reported sooner.

The police questioned Melissa in Pope's presence. Pope did not contradict Melissa's denial of abusing the child. In fact, Pope, in response to inquiry by the police, said that the baby did not fall, and told them that she had not seen Melissa strike the baby. She explained this untruth in subsequent statements to the police: "[I]t was her body in the flesh, but it wasn't her, because it was something else."

Pope, Melissa and Angela attended the evening service at the church. Melissa reverted to God during the service and

Reverend Hart restrained her and attempted to convince her that she was not Jesus Christ. Melissa refused to go to her grandfather's home and returned home with Pope. The next morning Pope was again interviewed at the police station and wrote a full explanation of what had happened. She later made an oral statement which was recorded.

## I

### THE CRIME OF CHILD ABUSE

*The Statute*

The General Assembly first evidenced its concern with the mistreatment of children fifteen years ago when it added § 11A to Art. 27 of the Maryland Code,[5] later codified as § 35A of that article,[6] declaring an assault on a child to be a felony. The statute in its entirety provided:

> "Any parent, adoptive parent or other person who has the permanent or temporary care or custody of a minor child under the age of fourteen years who maliciously beats, strikes, or otherwise mistreats such minor child to such degree as to require medical treatment for such child shall be guilty of a felony, and upon conviction shall be sentenced to not more than fifteen years in the Penitentiary."

The Legislature's increasing interest in child abuse is reflected in the amendment from time to time of the seminal statute.[7] The result is a comprehensive scheme to fulfill the legislative intent and purpose, expressed in 1973,[8] as "the protection of children who have been the subject of abuse by mandating the reporting of suspected abuse, by extending immunity to those who report in good faith, by requiring prompt investigations of such reports and by causing

---

5. Acts 1963, ch. 743.
6. Acts 1970, ch. 500.
7. *See* Acts 1964, ch. 103; Acts 1966, ch. 221; Acts 1967, ch. 38; Acts 1968, ch. 702; Acts 1970, ch. 500; Acts 1973, ch. 656; Acts 1973, ch. 835; Acts 1974, ch. 372; Acts 1974, ch. 554; Acts 1975, ch. 219; Acts 1977, ch. 290; Acts 1977, ch. 504.
8. Acts 1973, ch. 835

immediate, cooperative efforts by the responsible agencies on behalf of such children." Md. Code (1957, 1976 Repl. Vol.) Art. 27, § 35A. All of these were, of course, imposed over the felonious crime of child abuse. *See* subsections (a) through (j).

## *The Nature of Child Abuse*

As we have seen, when the crime was first created by the General Assembly it comprised the malicious beating, striking or otherwise mistreating a child to such degree as to require medical treatment. We pointed out in *State v. Fabritz,* 276 Md. 416, 348 A. 2d 275 (1975), *cert. denied,* 425 U. S. 942 (1976), that by the terms of the enactment it did not reach acts "not constituting, in one form or another, an assault on a child." *Id.* at 423. Acts 1973, ch. 835 repealed the "maliciously beats, strikes or otherwise mistreats" test of child abuse and substituted in its place a new and different measure of the offense. The 1973 amendment added a definition subsection to § 35A. Subsection (b) 7 provided that whenever "abuse" was used in § 35A, it shall mean "any physical injury or injuries sustained by a child as a result of cruel or inhumane treatment or as a result of malicious act or acts. . . ." Acts 1974, ch. 554 designated this meaning as item (A) of ¶ 7 and expanded the definition of child abuse by adding item (B) so as to include in the offense "any sexual abuse of a child, whether physical injuries are sustained or not." The amendment also added ¶ 8 defining "sexual abuse" to mean "any act or acts involving sexual molestation or exploitation, including but not limited to incest, rape, carnal knowledge, sodomy or unnatural or perverted sexual practices on a child. . . ." Acts 1977, ch. 290, substituted "or sexual offense in any degree" for "carnal knowledge" in ¶ 8.[9]

We considered the scope of item A, subsection (b) 7 in *Fabritz.* Applying the rules of statutory construction, 276 Md.

---

9. In Bowers v. State, 283 Md. 115, 389 A. 2d 341 (1978), we rejected the contention that the definition of abuse was so indefinite as not to comport with the established standards of due process. We opined that "the definition of abuse ... represents a most suitable compromise between the constitutionally mandated requirements of specificity and the practical need to devise language flexible enough to combat a social evil of truly inestimable proportions." *Id.* at 129.

at 421-423, we thought "it evident that the Legislature plainly intended to broaden the area of proscribed conduct punishable in child abuse cases." *Id.* at 423-424. We said:

> "Its use in the amended version of § 35A of the comprehensive phraseology 'who causes abuse to' a minor child, coupled with its broad two-pronged definition of the term 'abuse,' supports the view that the Legislature, by repealing the narrow measure of criminality in child abuse cases then provided in § 35A, and redefining the offense, undertook to effect a significant change of substance in the scope of the statute's prohibitions. In making it an offense for a person having custody of a minor child to 'cause' the child to suffer a 'physical injury,' the Legislature did not require that the injury result from a physical assault upon the child or from any physical force initially applied by the accused individual; it provided instead, in a more encompassing manner, that the offense was committed if physical injury to the child resulted either from a course of conduct constituting 'cruel or inhumane treatment' or by 'malicious act or acts.' " *Id.* at 424.

We found that the failure of the mother to seek or obtain any medical assistance for her child, although the need therefor was obviously compelling and urgent, caused the child to sustain bodily injury additional to and beyond that inflicted upon the child by reason of the original assault by another. The act of omission by the mother "constituted a cause of the further progression and worsening of the injuries which led to [the child's] death; and that in these circumstances [the mother's] treatment of [the child] was 'cruel or inhumane' within the meaning of the statute and as those terms are commonly understood." *Id.* at 425-426. We therefore vacated the judgment of the Court of Special Appeals, which in *Fabritz v. State*, 24 Md. App. 708, 332 A. 2d 324 (1975), had

reversed the judgment of the trial court entered upon the conviction of the mother of child abuse.[10]

## Responsibility for Abuse of a Child

In *Fabritz* we went no farther than to determine that the Legislature intended that the "cause" of an injury may include an act of omission so as to constitute cruel or inhumane treatment, in that case the failure of the mother to seek or obtain medical assistance for her child who had been abused by another. *Fabritz* did not go to the class of persons to whom the statutory proscription applies, as the accused there was a "parent," the victim's mother, expressly designated in the statute.

10. Habeas corpus was refused by the United States District Court for the District of Maryland to the convicted mother. On appeal, the United States Court of Appeals for the Fourth Circuit by a majority of a three judge panel, Haynsworth, C. J. dissenting, vacated the judgment and remanded the case to the District Court to grant the writ. Fabritz v. Superintendent, 583 F. 2d 697 (1978). In so doing the court accepted "the statute as valid, as did the Court of Appeals of Maryland and the District Court, and accept[ed], too, their clear exposition of the critical words of the law." 583 F. 2d at 700. It held that "[t]he statute simply was unconstitutionally applied." *Id.* It viewed the conviction void for denial of Fourteenth Amendment due process "because the 'conviction [is] based on a record lacking any relevant evidence as to a crucial element of the offense charged,' *i.e.,* that the mother had knowledge of the critical gravity of her daughter's condition when she deferred resort to medical advice for the little girl." 583 F. 2d at 698.

We had found it to be manifest from the evidence that the mother knew of the child's severely beaten condition and had failed for some eight hours to seek or obtain any medical assistance although, as the evidence plainly indicated, the need therefor was obviously compelling and urgent. We observed that there was evidence that the mother's failure to seek assistance was based upon her realization that the bruises covering the child's body would become known were the child examined or treated by a physician. State v. Fabritz, 276 Md. 416, 425, 348 A. 2d 275 (1975), *cert. denied,* 425 U. S. 942 (1976). Chief Judge Haynsworth was in accord. He did not agree with the majority of the panel that the record was devoid of evidentiary support. He found therein evidence sufficient to support a conclusion that the mother, though generally loving and protective of her daughter, consciously refrained from seeking medical help to protect her lover, the person who beat the child, from possible criminal charges and to support her own ego. "[A] conscious indulgence of such a preference," he thought, "is in violation of Maryland's Child Abuse Law...." 583 F. 2d 701 (Haynsworth, C. J. dissenting).

We note that, unlike decisions of the Supreme Court of the United States, decisions of federal circuit courts of appeals construing the federal constitution and acts of the Congress pursuant thereto, are not binding upon us. Declaration of Rights, Md. Const., Art. 2; Gayety Books v. City of Baltimore, 279 Md. 206, 213, 369 A. 2d 581 (1977); Wiggins v. State, 275 Md. 689, 698-716, 344 A. 2d 80 (1975). We are not persuaded to depart from our view of the evidence by the majority opinion of the federal appellate court.

We have seen that the statute as originally enacted concerned "[a]ny parent, adoptive parent or other person, who has the permanent or temporary care or custody of a minor child. . . ." Acts 1963, ch. 743. This has been once amended to bring within the ambit of the statute any person who has "responsibility for the supervision of a minor child." Acts 1966, ch. 221. Thus, since 1 June 1966,

> "[a]ny parent, adoptive parent or other person who has the permanent or temporary care or custody or responsibility for the supervision of a minor child under the age of eighteen years [11] who causes abuse to such minor child shall be guilty of a felony. . . ." § 35A (a).

Persons subject to the statute are designated in those terms also in subsection (b) 7 (A) defining abuse and in subsection (b) 8 defining sexual abuse.

In *Bowers v. State,* 283 Md. 115, 389 A. 2d 341 (1978), we discussed the class of persons to whom § 35A applies, in rejecting the contention that the statute was vague and therefore constitutionally defective for the reason that it failed to define adequately that class. Bowers urged that the statute was too indefinite to inform a person who is not a parent or adoptive parent of a child whether he comes within the ambit of the statute. He argued that no one in such position is capable of ascertaining whether the statute is aimed only at persons who have been awarded custody by judicial decree or includes also those who may simply be caring for a child in place of the parent. We were of the view that the General Assembly intended that the statute apply to persons who stand in loco parentis to a child. We said: "Had the Legislature wished to narrow application of the child abuse law to those who had been awarded custody or control by court order, it could readily have done so in explicit language to that end." *Id.* at 130. We observed that Bowers' "own testimony amply established that he had assumed 'the care or

---

11. Under Acts 1963, ch. 743 the statute applied to a child under the age of fourteen years. By Acts 1966, ch. 221 the statute was made applicable to a child under the age of sixteen years, and by Acts 1973, ch. 835 to a child under the age of eighteen years.

custody or responsibility for the supervision' of his step-daughter, and thus stood in loco parentis with respect to her." *Id.*

Bowers' challenge centered on the "temporary care or custody" provision of the statute. It does not follow from our holding that "permanent or temporary care or custody" is synonymous with "responsibility for the supervision of." Such was clearly not the legislative intent, because, as we have seen, the latter provision was added by amendment three years after the former had been written into the law. There would have been no need to do so had the Legislature deemed the two provisions to have the same meaning.

The child abuse statute speaks in terms of a person who "has" responsibility for the supervision of a minor child. It does not prescribe how such responsibility attaches or what "responsibility" and "supervision" encompass. A doubt or ambiguity exists as to the exact reach of the statute's provision with respect to "has responsibility for the supervision of," justifying application of the principle that permits courts in such circumstances to ascertain and give effect to the real intention of the Legislature. *See Fabritz* at 423; *Clerk v. Chesapeake Beach Park,* 251 Md. 657, 663-664, 248 A. 2d 479 (1968); *Domain v. Bosley,* 242 Md. 1, 7, 217 A. 2d 555 (1966). *Bowers* equates "permanent or temporary care or custody" with "in loco parentis," but "responsibility for the supervision of" is not bound by certain of the strictures required for one to stand in place of or instead of the parent. A person in loco parentis is "charged, factitiously, with a parent's rights, duties, and responsibilities." Black's Law Dictionary (4th ed. 1951). "A person *in loco parentis* to a child is one who means to put himself in the situation of the lawful father [or mother] of the child with reference to the father's [or mother's] office and duty of making provision for the child. Or, as defined by Sir Wm. Grant, Master of the Rolls, a person *in loco parentis* is one, 'assuming the parental character and discharging parental duties.' *Weatherby v. Dixon,* 19 Ves. 412. . . . There must be some: indication, in some form, of an intention to establish it. It is a question of intention." *Von der Horst v. Von der Horst,* 88 Md. 127, 130-131, 41 A. 124 (1898).

"The term 'in loco parentis,' according to its generally accepted common law meaning, refers to a person who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation without going through the formalities necessary to legal adoption. It embodies the two ideas of assuming the parental status and discharging the parental duties. *Niewiadomski v. United States,* 159 F. 2d 683, 686 (6th Cir.), *cert. denied,* 331 U. S. 850 (1947).

"This relationship involves more than a duty to aid and assist, more than a feeling of kindness, affection or generosity. It arises only when one is willing to assume all the obligations and to receive all the benefits associated with one standing as a natural parent to a child." *Fuller v. Fuller,* 247 A. 2d 767 (D.C. 1968), *appeal denied,* 418 F. 2d 1189 (1969).

A person may have the responsibility for the supervision of a minor child in the contemplation of § 35A although not standing in loco parentis to that child. "Responsibility" in its common and generally accepted meaning denotes "accountability," and "supervision" emphasizes broad authority to oversee with the powers of direction and decision. *See* American Heritage Dictionary of the English Language (1969); Webster's Third New International Dictionary (1968). As in the case of care or custody of a minor child under the child abuse law, a judicial decree is not necessary to obtain responsibility for the supervision of a minor child under that statute. Had the Legislature wished to narrow application of that law to those who had been charged with responsibility for the supervision of a child by court order, it could readily have done so in explicit language to that end. *See Bowers,* 283 Md. at 130. Absent a court order or award by some appropriate proceeding pursuant to statutory authority, we think it to be self-evident that responsibility for supervision of a minor child may be obtained only upon the mutual consent, expressed or implied, by the one legally charged with the care of the child and by the one assuming the responsibility. In other words, a parent may not impose

responsibility for the supervision of his or her minor child on a third person unless that person accepts the responsibility, and a third person may not assume such responsibility unless the parent grants it. So it is that a baby sitter temporarily has responsibility for the supervision of a child; the parents grant the responsibility for the period they are not at home, and the sitter accepts it. And it is by mutual consent that a school teacher has responsibility for the supervision of children in connection with his academic duties. On the other hand, once responsibility for the supervision of a minor child has been placed in a third person, it may be terminated unilaterally by a parent by resuming responsibility, expressly or by conduct. The consent of the third party in such circumstances is not required; he may not prevent return of responsibility to the parent. But, of course, the third person in whom responsibility has been placed is not free to relinquish that responsibility without the knowledge of the parent. For example, a sitter may not simply walk away in the absence of the parents and leave the children to their own devices.

Under the present state of our law, a person has no legal obligation to care for or look after the welfare of a stranger, adult or child.

> "Generally one has no legal duty to aid another person in peril, even when that aid can be rendered without danger or inconvenience to himself. . . . A moral duty to take affirmative action is not enough to impose a legal duty to do so." W. LaFave & A. Scott, Criminal Law 183 (1972).

*See* Clark & Marshall, A Treatise on the Law of Crimes § 10.02 (7th ed. 1967). The legal position is that "the need of one and the opportunity of another to be of assistance are not alone sufficient to give rise to a legal duty to take positive action." R. Perkins, Criminal Law 594-595 (2d ed. 1969). Ordinarily, a person may stand by with impunity and watch another being murdered, raped, robbed, assaulted or otherwise unlawfully harmed. "He need not shout a warning to a blind man headed for a precipice or to an absentminded one walking into a gunpowder room with a lighted candle in

hand. He need not pull a neighbor's baby out of a pool of water or rescue an unconscious person stretched across the railroad tracks, though the baby is drowning, or the whistle of an approaching train is heard in the distance." LaFave & Scott at 183. The General Assembly has enacted two "Good Samaritan" statutes which afford protection to one who assists another in certain circumstances. Those statutes, however, impose no requirement that assistance be rendered.[12]

In the face of this status of the law we cannot reasonably conclude that the Legislature, in bringing a person responsible for the supervision of a child within the ambit of the child abuse law, intended that such responsibility attach without the consent criteria we have set out. Were it otherwise, the consequences would go far beyond the legislative intent. For example, a person taking a lost child into his home to attempt to find its parents could be said to be responsible for that child's supervision. Or a person who allows his neighbor's children to play in his yard, keeping a watchful eye on their activities to prevent them from falling into harm, could be held responsible for the children's supervision. Or a person performing functions of a maternal nature from concern for the welfare, comfort or health of a child, or protecting it from danger because of a sense of moral obligation, may come within the reach of the act. In none of these situations would there be an intent to grant or assume the responsibility contemplated by the child abuse statute, and it would be incongruous indeed to subject such persons to possible criminal prosecution.

---

12. Maryland Code (1957, 1976 Repl. Vol.) Art. 27, § 12A provides:

"Any person witnessing a violent assault upon the person of another may lawfully aid the person being assaulted by assisting in that person's defense. The force exerted upon the attacker or attackers by the person witnessing the assault may be that degree of force which the assaulted person is allowed to assert in defending himself."

Code (1957, 1971 Repl. Vol., 1978 Cum. Supp.) Art. 43, § 132 grants immunity from liability from civil damages to physicians and certain other persons rendering aid under emergency conditions.

*The Sufficiency of the Evidence*

The trial court found Pope guilty of the crime of child abuse as a principal in the first degree, and alternatively, as a principal in the second degree. A principal in the first degree is the one who actually commits a crime, either by his own hand, or by an inanimate agency, or by an innocent human agent. A principal in the second degree is one who is actually or constructively present when a felony is committed, and who aids or abets in its commission. *See Camphor v. State,* 233 Md. 203, 205, 196 A. 2d 75 (1963); *Thornton v. State,* 232 Md. 542, 544, 194 A. 2d 617 (1963); *Veney v. State,* 225 Md. 237, 238, 170 A. 2d 171 (1961); *Agresti v. State,* 2 Md. App. 278, 280, 234 A. 2d 284 (1967); 4 W. Blackstone, Commentaries *34; Clark & Marshall, A Treatise on the Law of Crimes §§ 8.01-8.02 (7th ed. 1967); L. Hochheimer, Crimes and Criminal Procedure §§ 31-32 (1st ed. 1897); R. Perkins, Criminal Law 656 and 658 (2d ed. 1969).[13]

In convicting Pope, the trial court was "satisfied beyond a reasonable doubt that under the doctrine of [*Fabritz*] . . . , [she] is a principal [in the first degree] and is guilty of child abuse." It further held, however: "If this interpretation of *Fabritz* is in error, then [Pope] is guilty as a principal in the second degree." On direct appeal, the Court of Special

13. We have observed: "In Maryland, as in many other states, there is little practical difference between a principal in the first and second degree," and we characterized such difference as "a shadowy distinction." Vincent v. State, 220 Md. 232, 239, n. 1, 151 A. 2d 898 (1959). Clark & Marshall, A Treatise on the Law of Crimes (7th ed. 1967) elaborated the point:

"The common law recognizes no difference in the punishment, between principals in the first and second degree, but regards them as equally guilty, and subject to the same punishment. In practice the distinction is immaterial and on an indictment charging one as principal in the first degree, he may be convicted on evidence showing that he was present aiding and abetting, and conversely.

"And at common law a principal in the second degree may be indicted and convicted before trial of the principal in the first degree, and even after he has been acquitted, or convicted of an offense of lesser degree, though the commission of the act by the principal in the first degree must be proved in order to convict one as aiding and abetting." *Id.* at § 8.05, p. 521.

*See* Hochheimer §§ 37-38. And "unless it is plain, from the nature of an offense made a felony by statute, that the provisions of the statute were intended to affect only the party actually committing the offense, aiders and abettors are punishable." Clark & Marshall at § 8.04, p. 520.

Appeals applied Maryland Rule 1086 and set aside the judgment. The rule provides that when a criminal case is tried without the intervention of a jury, the Court of Special Appeals shall review both the law and the evidence but "the judgment of the [trial] court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the [trial] court to judge the credibility of the witnesses." The appellate court's function "is merely to decide whether there was sufficient evidence, or proper inferences from the evidence, from which the trier of fact could properly draw the conclusion of the [accused's] guilt, beyond a reasonable doubt." *Brooks v. State,* 277 Md. 155, 161-162, 353 A. 2d 217 (1976), and cases therein cited. The trial court, as the trier of facts, is not only the judge of the witness's credibility, but is also the judge of the weight to be attached to the evidence. *Id.* The Court of Special Appeals determined that the evidence was not legally sufficient to sustain the conviction of Pope either as a principal in the first degree or a principal in the second degree. The evidence was deficient with regard to her being a principal in the first degree in that it was not sufficient for the trier of fact to find beyond a reasonable doubt that she was within the class of persons subject to the prohibitions of the child abuse statute. Thus, the teaching of *Fabritz* regarding "causing abuse" was in no event applicable. *Pope v. State,* 38 Md. App. at 538. It was deficient with regard to her being a principal in the second degree because, despite her presence during the commission of the felony, it was not sufficient for the trier of fact to conclude that she aided and abetted the actual perpetrator. Therefore, the judgment of the trial court on the evidence was clearly erroneous and had to be set aside. *Id.* at 539-541.

As did the Court of Special Appeals, we find evidentiary insufficiency with respect to the conviction of Pope of child abuse, both as a principal in the first degree and as a principal in the second degree, so that the judgment of the trial court on the evidence was clearly erroneous. We, therefore, affirm the judgment of the Court of Special Appeals. We explain why we find that the evidence was legally insufficient.

*Principal in the First Degree*

As we have indicated, a person may be convicted of the felony of child abuse created by § 35A as a principal in the first degree upon evidence legally sufficient to establish that the person

(1) was

    (a) the parent of, or
    (b) the adoptive parent of, or
    (c) in loco parentis to, or
    (d) responsible for the supervision of

  a minor child under the age of eighteen years, AND

(2) caused, by being in some manner accountable for, by act of commission or omission, abuse to the child in the form of

    (a) physical injury or injuries sustained by the child as the result of

      i) cruel or inhumane treatment, or
      ii) malicious act or acts by such person, or

    (b) any act or acts by such person involving sexual molestation or exploitation whether or not physical injuries were sustained.

Under the teaching of *Fabritz,* Pope's lack of any attempt to prevent the numerous acts of abuse committed by the mother over a relatively protracted period and her failure to seek medical assistance for the child, although the need therefor was obviously compelling and urgent, could constitute a cause for the further progression and worsening of the injuries which led to the child's death. In such circumstances, Pope's omissions constituted in themselves cruel and inhumane treatment within the meaning of the statute. *See Fabritz,* 276 Md. at 425-426. It follows that Pope would be guilty of child abuse *if her status brought her within the class of persons specified by the statute.* It being clear

that she was neither the child's parent nor adoptive parent, and there being no evidence sufficient to support a finding that she had "the permanent or temporary care or custody" of the child as that status was construed in *Bowers v. State, supra,* so as to be in loco parentis to the child, the sole question is whether she had "responsibility for the supervision of" the child in the circumstances. If she had such responsibility the evidence was legally sufficient to find her guilty of child abuse as a principal in the first degree.

The State would have us translate compassion and concern, acts of kindness and care, performance of maternal functions, and general help and aid with respect to the child into responsibility for the supervision of the child. The crux of its argument is that although Pope was not under any obligation to assume responsibility for the supervision of the child at the outset, "once she undertook to house, feed, and care for [the mother and child], she did accept the responsibility and came within the coverage of the statute." But the mother was always present.[14] Pope had no right to usurp the role of the mother even to the extent of responsibility for the child's supervision. We are in full accord with the view of the Court of Special Appeals that it could not "in good conscience hold that a person who has taken in a parent and child is given the responsibility for the child's supervision and protection even while the child is in the very arms of its mother." *Pope,* 38 Md. App. at 538. It would be most incongruous that acts of hospitality and kindness, made out of common decency and prompted by sincere concern for the well-being of a mother and her child, subjected the Good Samaritan to criminal prosecution for abusing the very child he sought to look after. And it would be especially ironic were such criminal prosecution to be predicated upon an obligation to take

14. Before the Court of Special Appeals the State explained the mother's continual presence and exercise of supervision from time to time while she was awake as conduct permitted by Pope but manifesting "no indication whatsoever that [Pope] intended to relinquish her responsibility." As the Court of Special Appeals correctly observed: "That puts the cart before the horse. It is the mother whose responsibility was not relinquished or absolved." Pope v. State, 38 Md. App. 520, 537-538, 382 A. 2d 880 (1978). Before us, the State has apparently abandoned the notion it suggested before the intermediate court.

affirmative action with regard to abuse of the child by its mother, when such obligation arises solely from those acts of hospitality and kindness.

The evidence does not show why Pope did not intervene when the mother abused the child or why she did not, at least, timely seek medical assistance, when it was obvious that the child was seriously injured. Whether her lack of action was from fear or religious fervor or some other reason is not clearly indicated. As the Court of Special Appeals correctly stated "[Pope's] testimony sought to indicate that her passivity was motivated by fear but other evidence belied that inference." *Pope,* 38 Md. App. at 532. The court observed that when Pope's sister arrived shortly after the acts of abuse and the mother's frenzy had diminished, Pope did not tell her sister what had occurred, although she claimed that she tried to but could not do so. But Pope's conduct, during and after the acts of abuse, must be evaluated with regard for the rule that although she may have had a strong moral obligation to help the child, she was under no legal obligation to do so unless she then had responsibility for the supervision of the child as contemplated by the child abuse statute. She may not be punished as a felon under our system of justice for failing to fulfill a moral obligation, and the short of it is that she was under no legal obligation. In the circumstances, the mother's acquiescence in Pope's conduct was not a grant of responsibility to Pope for the supervision of the child, nor was Pope's conduct an acceptance of such responsibility. "[Pope's] concern for the child [did] not convert to legal responsibility nor parental prerogatives." *Pope,* 38 Md. App. at 538. We hold that the evidence was not sufficient in law to prove that Pope fell within that class of persons to whom the child abuse statute applies. Thus it is that the judgment of the trial court that she was a principal in the first degree in the commission of the crime of child abuse was clearly erroneous and must be set aside.

The mental or emotional state of the mother, whereby at times she held herself out as God, does not change the result. We see no basis in the statute for an interpretation that a person "has" responsibility for the supervision of a child, if

that person believes or may have reason to believe that a parent is not capable of caring for the child. There is no right to make such a subjective judgment in order to divest parents of their rights and obligations with respect to their minor children, and therefore, no obligation to do so.[15]

## Principal in the Second Degree

Pope was actually present when the felony was committed, but, we have determined, she was not a perpetrating actor. She would be a principal in the second degree if she aided or abetted in the commission of the crime. The principal in the second degree differs from the principal in the first degree in that he does not do the deed himself or through an innocent agent but in some way participates in the commission of the felony by aiding, commanding, counseling or encouraging the actual perpetrator.[16] R. Perkins, Criminal Law 658-659 (2d ed. 1969); Clark & Marshall, A Treatise on the Law of Crimes § 8.02 (7th ed. 1967). Unless he contributed actual aid it is necessary that his approval should be manifested by some word or act in such a way that it operated on the mind of the perpetrator. Even the secret acquiescence or approval of the bystander is not sufficient to taint him with the guilt of the crime. "Counsel, command or encouragement may be in the form of words or gestures. Such a purpose 'may be manifested by acts, words, signs, motions, or any conduct

---

15. This State has enacted a comprehensive scheme, surrounded by safeguards, for determining whether a person is suffering from a mental illness or mental disorder so as to make it necessary or advisable for the welfare of the person so suffering or for the safety of the persons or property of others that the mentally ill person receive care and treatment. Maryland Code (1957, 1972 Repl. Vol., 1978 Cum. Supp.) Art. 59, § 1 et seq. It would be unthinkable to impose such a determination on an ordinary individual at the risk of criminal prosecution. Not even the "reasonable man," so often called upon by the law, has the expertise to make such a judgment.

16. The principal in the second degree differs from the accessory before the fact only in the requirement of presence. "The principal in the second degree must be present at the perpetration of the felony, either actually or constructively, whereas the accessory before the fact must be absent. In other words, although neither presence nor absence is of itself a determinant of guilt, yet if the mens rea is found to exist, the same aid, command, counsel, or encouragement which will make a principal in the second degree of one who is present (actually or constructively) at the time a felony is committed, will make him an accessory before the fact if he is absent." R. Perkins, Criminal Law 658-659 (2d ed. 1969).

which unmistakably evinces a design to encourage, incite, or approve of the crime.' Promises or threats are very effective for this purpose, but much less will meet the legal requirement, as where a bystander merely emboldened the perpetrator to kill the deceased. . . . One may also encourage a crime by merely standing by for the purpose of giving aid to the perpetrator if necessary, provided the latter is aware of this purpose. Guilt or innocence of the abettor . . . is not determined by the quantum of his advice or encouragement. If it is rendered to induce another to commit the crime and actually has this effect, no more is required." Perkins at 659. "To be guilty as a principal in the second degree, a criminal intent is necessary." Clark & Marshall § 8.02. "Aid or encouragement to another who is actually perpetrating a felony will not make the aider or encourager guilty of the crime if it is rendered without mens rea. It is without mens rea if the giver does not know or have reason to know of the criminal intention of the other. . . . In general it is the abettor's state of mind rather than the state of mind of the perpetrator which determines the abettor's guilt or innocence. . . . '[I]ntention' includes not only the purpose in mind but also such results as are known to be substantially certain to follow." Perkins at 662-663.

When the evidence here is viewed in the light of these criteria, it is patent that it was not legally sufficient to prove that Pope was a principal in the second degree. She neither actually aided the mother in the acts of abuse nor did she counsel, command or encourage her. The Court of Special Appeals pointed out the facts relied on by the trial court — that the events took place in Pope's home, that Pope responded to the commands of the mother, namely that she looked when told to look and came when called, that she voluntarily opened the door to her son's room so Melissa could reach him, and that she failed to interfere or question the mother's activity, even when the mother appeared rational — were simply not enough to meet the test. *Pope,* 38 Md. App. at 538-541.

The State concludes the argument in its brief:

"As is obvious from the evidence presented in this

case, [Pope] witnessed a terrible event. She stood by while Melissa Norris killed her three-month old son. [Pope's] conduct during the beating . . . should be held to be culpable."

The evidence certainly showed that Pope "witnessed a terrible event" and that she "stood by" while the mother killed the child. But the culpability for her conduct during the abuse of the child must be determined strictly within the law or else the basic tenets of our system of justice are prostituted. There is an understandable feeling of outrage at what occurred, intensified by the fact that the mother, who actually beat the child to death, was held to be not responsible for her criminal acts. But it is the law, not indignation, which governs. The law requires that Pope's conviction of the felony of child abuse be set aside as clearly erroneous due to evidentiary insufficiency.

## II

### *THE CRIME OF MISPRISION OF FELONY*

As we have indicated, a person may be convicted of a felony upon proof establishing that he committed the offense as a perpetrating actor (principal in the first degree), or that, being actually or constructively present, he did not himself commit the offense but aided and abetted in the commission of it (principal in the second degree). " 'If he be present,' said Sir Matthew Hale, 'and not aiding or abetting to the felony, he is neither principal nor accessory. If A and B be fighting and C, a man of full age, comes by chance, and is a looker on only, and assists neither, he is not guilty of murder or homicide, as principal in the second degree, but is a misprision, for which he shall be fined, unless he use means to apprehend the felon.' " [17] In the case before us, both the

---

17. 1 Hale, Pleas of the Crown, 439, as quoted in Clark & Marshall, A Treatise on the Law of Crimes § 8.02 (7th ed. 1967). Clark & Marshall § 8.02, p. 511, n. 15, also quotes 2 Hawkins, Pleas of the Crown, c. 29, § 10 on the matter:

" 'Those who, by accident. are barely present when a felony is committed, and are merely passive, and neither in any way encourage it, nor endeavor to hinder it. nor to apprehend the

trial court and the Court of Special Appeals believed that the misdemeanor of misprision of felony exists in Maryland today. The Court of Special Appeals expressly held "that misprision of felony was a crime at common law given life in Maryland by Art. 5 of the Declaration of Rights.[18] It rejected the contention that the crime "has become obsolete or abandoned by disuse" as "without merit." *Pope,* 38 Md. App. at 527.[19]

There is no Maryland legislative enactment which is declarative of the common law crime of misprision of felony or which may be deemed to have created a comparable offense. Therefore, if misprision of felony is a crime in this State, it is only because it was part of the common law of England to which the inhabitants of Maryland were constitutionally entitled and has survived to the present time.

We assume, *arguendo,* that misprision of felony was a crime under the common law of England, and that it became the law of this State pursuant to Art. 5 of the Declaration of Rights. The question is whether it is to be deemed an indictable offense in Maryland today. In determining the question, we look first to what misprision of felony is. According to Blackstone, the crime at common law consisted merely in the "concealment of a felony which a man knows, but never assented to; for if he assented this makes him either principal or accessory." 4 W. Blackstone, Commentaries *121. *See* Clark & Marshall, A Treatise on the Law of Crimes § 8.14 (7th ed. 1967); R. Perkins, Criminal Law 512 (2d ed. 1969); L.

---

offenders, shall neither be adjudged principles [sic] nor accessories; yet, if they be of full age, they are highly punishable by fine and imprisonment for their negligence, both in not endeavoring to prevent the felony, and in not endeavoring to apprehend the offender.' "

18. "[T]he inhabitants of Maryland are entitled to the Common Law of England ... according to the course of that Law . . . ." Declaration of Rights, Md. Const. Art. 5.

19. The Circuit Court for Carroll County reached the opposite view, dismissing a charging document before it on the ground that misprision of felony is not a crime in Maryland. State v. Shaw, 282 Md. 231, 232, 383 A. 2d 1104 (1978). The State appealed. On our review upon grant of writ of certiorari prior to decision by the Court of Special Appeals, we disposed of the appeal upon a double jeopardy issue making it unnecessary for us to address the question whether misprision of felony is a crime in this State. *Id.* at 232, n. 2 and at 237.

Hochheimer, Crimes and Criminal Procedure § 39 (1st ed. 1897).

"[T]here is reason to believe that misprision of felony as defined by Blackstone is merely one phase of the system of communal responsibility for the apprehension of criminals which received its original impetus from William I, under pressure of the need to protect the invading Normans in hostile country, and which endured up to the Seventeenth Century in England. In order to secure vigilant prosecution of criminal conduct, the vill or hundred in which such conduct occurred was subject to fine, as was the tithing to which the criminal belonged, and every person who knew of the felony and failed to make report thereof was subject to punishment for misprision of felony. Compulsory membership in the tithing group, the obligation to pursue criminals when the hue and cry was raised, broad powers of private arrest, and the periodic visitations of the General Eyre for the purpose of penalizing laxity in regard to crime, are all suggestive of the administrative background against which misprision of felony developed. With the appearance of specialized and paid law enforcement officers, such as constables and justices of the peace in the Seventeenth Century, there was a movement away from strict communal responsibility, and a growing tendency to rely on professional police." 8 U. Chi. L. Rev. 338, 340-341 (1941) (footnotes omitted).

Glazebrook, *Misprision of Felony — Shadow or Phantom?,* 8 Am. J. of Legal History 189 and 283 (1964) cites eminent authority that in England the offense fell "into desuetude." *Id.* at 300. According to Glazebrook, there was no "reported decision during the four hundred years since the offence first crept into a book," and no book before J. Chitty, A Practical Treatise on the Criminal Law (2d ed., London 1826) contained "a precedent of an indictment for misprision of felony." *Id.* In any event, if the crime had died, it was resurrected by the

House of Lords in *H. L. Sykes v. Director of Public Prosecution,* [1961] 3 All E. R. 33. Lord Denning stated that "it is plain that there is and always has been an offence of misprision of felony and that it is not obsolete." [20] *Id.* at 40. *Sykes* acknowledged only two necessary elements, knowledge and concealment. "[M]isprision requires nothing active. The failure or refusal to disclose the felony is enough." *Id.* at 41. This followed the Blackstone definition.

The "revival" in England of the crime of misprision of felony was not generally welcomed. "Resistance to the crime culminated in the Seventh Report of the Criminal Law Revision Committee which recommended the abolition of the crime of misprision by eliminating all distinctions between felonies and misdemeanors. Misprision was replaced in the report by a new crime of withholding information with regard to certain offenses for a consideration other than restitution. [An agreement not to prosecute a felon in consideration of the return or compensation for goods stolen constitutes the common law offense of compounding a felony.] The Criminal Law Act of 1967 [c. 58 §§ 1 and 5] adopted these two recommendations and has been interpreted as eliminating the crime of misprision of felony in England." Comment, *Misprision of Felony: A Reappraisal,* 23 Emory L. J. 1095, 1100-1101 (1974). *See* W. Wade and B. Lilliwhite, Annual Survey of Commonwealth Law 179 (1965); 10 Halsbury's Law of England ¶1201 (Supp. 1978).

The American experience paralleled that of England; the common law offense was simply not used. The status of the crime in the United States was summed up in Glazebrook,

---

**20.** There was further recognition of the crime of misprision of felony in Rex v. King [1965] 1 All E. R. 1053 (Crim. App.). It was held that, after being cautioned against self-incrimination, the defendant's silence can not possibly constitute misprision. When an accused is questioned about an offense, he is not bound to answer if his reply would incriminate him regarding that offense or any other offense. On the other hand, if after caution, he chooses to say something which conceals the felony, then this will amount to active concealment, not protected by the right against self-incrimination and may constitute misprision. *Id.* at 1055. *See* Comment, Misprision of Felony: A Reappraisal, 23 Emory L. J. 1095, 1100 (1974).

*How Long, Then, Is The Arm Of The Law To Be?,* 25 Mod. L. Rev. 301, 307, n. 51 (1962):

"No court in the United States has been prepared to adopt the English doctrine in its simplicity, and hold that a mere failure to disclose knowledge of a felony is itself an offence: *State v. Hann* 40 N.J.L. 288 (1878) often cited as a solitary exception (e.g. (1945) 32 Va.L.R. 172) was a decision on a statutory, not the common law offence. In several states an attempt has been made to establish an offence intermediate between a simple concealment and that of the accessory after: e.g., *State v. Wilson* 80 Vt. 249; 67 Atl. 533 (1907); *State v. Biddle* 2 Harr (Del.) 401; 124 Atl. 804 (1923);[21] *Carpenter v. State* 62 Ark. 286; 36 S. W. 900 (1896); *Commonwealth v. Lopes* (Mass.) 61 N.E. (2d) 849 (1945); *State v. Graham* 100 La. 669 (1938): '. . . in the modern acceptation of the term, misprision of felony is almost if not exactly the same as that of an accessory after the fact' (p. 680). The utility of such an offence has not, however, been demonstrated: '. . . perhaps not a single case can be cited in which punishment for such connection with a felony has been inflicted in the U.S.' — 2 McClain *Criminal Law,* s. 938, cited at (1953) 6 S.Car. L.Q. 91. In Michigan, where the constitution incorporates the common law of crimes, the Supreme Court held that this does not extend to misprision of felony since it is 'wholly unsuited to American criminal law and procedure as used in this State'; *State v. Lefkovitz* 294 Mich. 263, 293 N.W. 642 (1940); *cf. U.S. v. Worcester* 190 F.Supp. 565-566 (1960). And in interpreting the Federal statute (1 Stat. 113, s. 6) [18

21. State v. Biddle, 32 Del. 401, 124 A. 804 (1923) is a report of a charge to the jury by the Court of General Sessions to the effect that the common law crime of misprision existed in Delaware and that it may consist of wilful failure and neglect either to make an effort to prevent the felony being committed or to prosecute the felon. The official report states that the defendant was acquitted. The West report asserts that she was convicted. We are informed by the Bureau of Archives and Records of Delaware that the docket entries for the case, indictment no. 20, November Term, 1923, show that the defendant was acquitted.

U.S.C. § 4 (1976)] which provides that 'whoever having knowledge of the actual commission, of a felony cognizable by a court of the United States conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the U.S. shall be fined not more than $500 or imprisoned not more than three years or both,' it has been held that there must be some affirmative act of concealment, for instance the suppression of evidence, the harbouring of the criminal or the intimidation of witnesses, as well as the failure to disclose, for otherwise 'the words *conceals and* would be effectively excised from the statute.' This interpretation was necessary to rescue the statute from an 'intolerable oppressiveness,' for while federal statutes were few when it was enacted in 1790, the great increase in their number would make it unenforceable today if any other were adopted: *Bratton v. U.S.* 73 F. (2d) 795 [10th cir.] (1934); followed *Neal v. U.S.* 102 F. (2d) 643 (1939). [*See also United States v. Farrer*, 38 F. 2d 515 (D. Mass.), aff'd, 281 U. S. 624 (1930).] This policy appears to have been successful. In 1956 the Fifth Circuit Court of Appeals noticed that 'the annotations indicate no conviction for misprision [under the Federal statute] affirmed': *Miller v. U.S.,* 230 F. (2d) 486. *Cf. Bratton v. U.S.*: 's. 146 was enacted April 30, 1790 ... and as far as the researches of court and counsel disclose, has been before the courts but twice in the 144 years of its life' (p. 797)."

Perkins in the second edition (1969) of his Criminal Law states that "there seems to be no such offense as misprision of felony in most of the states." At 516. No such offense is included in the Model Penal Code (U.L.A.).[22] Four years ago, Florida followed Michigan's view announced in *Lefkovitz,*

---

22. The Model Penal Code (U.L.A.) would make it an offense to volunteer false information to a law enforcement officer, § 242.3 (4) and to aid the consummation of crime, § 242.4.

*supra,* that misprision of felony was wholly unsuited to American criminal law. *Holland v. State,* 302 So. 2d 806 (Fla. App. 1974). *Cf. Mangeris v. Gordon,* Nev., 580 P. 2d 481, 483-484 (1978). *Compare State v. Flynn,* 100 R. I. 520, 217 A. 2d 432 (1966), stating that the common law crime of misprision of felony was an indictable offense under the constitution and laws of Rhode Island.

A few states have enacted legislation creating a crime of misprision of felony substantially similar to the common law offense as defined in *Sykes. See* N.J.S.A. § 2A:97-2 (N.J. 1969); Ohio Rev. Code § 2921.22 (Spec. Supp. 1973); Wash. Rev. Code § 9.69.100 (1976). Two states had such statutes, *see* Me. Rev. Stat. title 17, § 902 (1964) and La. Rev. Stat. § 856 (1870), which were later repealed.

Maryland has been in line with the practically universal view of the other states. We find no case prior to the case *sub judice* in which a conviction of misprision of felony has reached an appellate court of this State and, insofar as can be ascertained from appellate dockets, there is only one other, *State v. Shaw,* 282 Md. 231, 383 A. 2d 1104 (1978), *see* note 19, *supra,* in which the crime was charged. It is true, as observed by the trial court in the case at hand, that "[a] dearth of appellate cases is not proof that the crime is not charged at trial level," but in view of the numerous appeals in criminal causes spawned by present day procedures and rights afforded an accused, it is remarkable indeed that, if convictions upon charge of the crime have occurred, the present case was the first in which an appeal was filed. We think that it is a fair inference that the crime has been seldom charged, and, if charged, has resulted in very few, if any, convictions. Furthermore, we observe that misprision of felony was not proposed as an offense by Maryland's Commission on Criminal Law.[23]

As it seems that misprision of felony has been virtually unused in Maryland since the Revolution gave birth to the

---

23. The Commission was obviously content with the more definitive offenses of "hindering prosecution" and "compounding a crime." *See* Maryland Commission on Criminal Law, Report and Part I of Proposed Criminal Code (1972) §§ 205.65-205.70 and § 215.50.

United States, our inquiry turns to the effect of non-use of a common law crime. Early on, in *State v. Buchanan,* 5 H. & J. 317, (1821), Buchanan, J. for the Court announced that no part of the common law of England to which the inhabitants of Maryland were constitutionally entitled should be excluded merely because it had not been introduced and used in the courts here. *Id.* at 358. *See McGraw v. State,* 234 Md. 273, 275-276, 199 A. 2d 229, *cert. denied,* 379 U. S. 862 (1964). Judge Buchanan explained:

> "[U]nlike a positive or statute law, the occasion or necessity for which may long since have passed away, if there has been no necessity before, for instituting a prosecution for conspiracy, no argument can be drawn from the *non-user* for resting on *principles* which cannot become obsolete, it has always potentially existed, to be applied as occasion should arise. If there had never been in Maryland, since the original settlement of the colony by our ancestors, a prosecution for murder, arson, assault and battery, libel, with many other common law offenses, and consequently no judicial adoption of either of these branches of the common law, could it therefore be contended, that there was now no law in the State for the punishment of such offenses?"
> 5 H. & J. at 358.

This principle was affirmed by us, implicitly at least, in *Harris v. Jones,* 281 Md. 560, 380 A. 2d 611 (1977) when we "recognized for the first time in Maryland the common law tort of intentional infliction of emotional distress, a tort previously unacknowledged or arguably abandoned by non-use." *Pope,* 38 Md. App. at 527. It does not follow, however, that because a common law crime does not become obsolete from mere non-use that it will always be viable. The opinion of the Court in *Buchanan* asserted that the provision in Art. 5 of the Declaration of Rights regarding entitlement to the common law of England without any restrictive words being used, had reference "to the common law in mass, as it existed here, *either potentially, or practically,* and as it prevailed in England at the time, *except such portions of it*

*as are inconsistent with the spirit of that instrument, and the nature of our new political institutions.*" 5 H. & J. at 358 (emphasis added). We have repeated that statement on a number of occasions, *Dashiell v. Attorney General,* 5 H. & J. 392, 401 (1822); *State v. Bank of Maryland,* 6 G. & J. 205, 226 (1834); *Lickle v. Boone,* 187 Md. 579, 582, 51 A. 2d 162 (1947); *McGraw v. State, supra,* 234 Md. at 275-276; *Gladden v. State,* 273 Md. 383, 389, 330 A. 2d 176 (1974). We put it this way in *Denison v. Denison,* 35 Md. 361, 378 (1872):

> "It is true the common law of England has been adopted by the people of this State, but only so far as it could be made to fit and adjust itself to our local circumstances and peculiar institutions."

What this means is that the common law is subject to change. This is clearly apparent from its derivation and its very nature:

> "The common law of *England* is derived from immemorial usage and custom, originating from Acts of Parliament not recorded, or which are lost, or have been destroyed. It is a system of jurisprudence founded on the immutable principles of justice, and denominated by the great luminary of the law of *England,* the perfection of reason. The evidence of it are treatises of the sages of the law, the judicial records and adjudications of the Courts of justice of *England.*" *Buchanan,* 5 H. & J. at 365 (opinion of Chase, C. J.).

It may be changed by legislative act as Art. 5 of the Declaration of Rights expressly provides. *See State v. Canova,* 278 Md. 483, 486, 365 A. 2d 988 (1976); *Lutz v. State,* 167 Md. 12, 15, 172 A. 354 (1934); *Harrison v. State,* 22 Md. 468, 487-488 (1864); *Coomes v. Clements,* 4 H. & J. 480, 481. It may also be changed by judicial decision. Chase, C. J., in his opinion in *Buchanan,* observed: "Whether particular parts of the common law are applicable to our local circumstances and situation, and our general code of laws and jurisprudence, is a question that comes within the province of the courts of

justice, and is to be decided by them." 5 H. & J. at 365-366. He gave this rationale:

> "The common law, like our acts of assembly, are subject to the control and modification of the Legislature, and may be abrogated or changed as the general assembly may think most conducive to the general welfare; so that no great inconvenience, if any, can result from the power being deposited with the judiciary to decide what the common law is, and its applicability to the circumstances of the state, . . . ." *Id.* at 366.[24]

We said in *Gilbert v. Findlay College,* 195 Md. 508, 513, 74 A. 2d 36 (1950) that "[t]his interpretation has been continuously adopted in this State, and was reaffirmed in the case of *Price v. Hitaffer,* 164 Md. 505, 510, 165 A. 470 [1933]." We asserted in *Ass'n of Taxi Oprs. v. Yellow Cab Co.,* 198 Md. 181, 204, 82 A. 2d 106 (1951): "We have frequently held that it is our duty to determine the common law as it exists in this state. . . ." [25] The doctrine of *stare decisis* does not preclude the exercise of this duty. We declared in *White v. King,* 244 Md. 348, 354, 223 A. 2d 763 (1966): "The doctrine of *stare decisis,* important as it is, is not to be construed as preventing us from changing a rule of law if we are convinced that the rule has become unsound in the circumstances of modern life." *Accord, Hearst Corp. v. St. Dep't of A. & T.,* 269 Md. 625, 643-644, 308 A. 2d 679 (1973).

Parts of the common law have been found by judicial mandate to be inapplicable or obsolete in other states. For example, *Flores v. Flores,* 84 N. M. 601, 506 P. 2d 345, 347

---

24. Chief Judge Chase continued: ". . . and what part has become obsolete from *non-user* or other cause." State v. Buchanan, 5 H. & J. 317, 366 (1821). The addendum, insofar as it applies to "non-user", does not appear to be in accord with the opinion of the Court rendered by Buchanan, J. as we have indicated.

25. We noted in Ass'n of Taxi Oprs. v. Yellow Cab Co., 198 Md. 181, 204-205, 82 A. 2d 106 (1951) that in determining the common law as it exists in this State, we have not always followed the view taken by the majority of other states, citing Mahnke v. Moore, 197 Md. 61, 77 A. 2d 923 (1951) and Damasiewicz v. Gorsuch, 197 Md. 417, 79 A. 2d 550 (1951). We believed that we were under no obligation to follow the majority view, unless we thought it better reasoned and sound.

(N.M. App.), *cert. denied,* 84 N. M. 592, 506 P. 2d 336 (1973) found that "liability free intentional injury to one's spouse does not reflect the circumstances in New Mexico." *Swartz v. United States Steel,* 293 Ala. 493, 304 So. 2d 881, 885 (1974) held that the common law rule that a wife has no cause of action for loss of her consortium is inconsistent with the institutions of Alabama. *Morganthaler v. First Atlantic National Bank,* 80 So. 2d 446 (Fla. 1955) rejected the English rule that a legatee may elect to receive cash when a testator directs his executor to purchase an annuity because it "dethrones a principle [that the intent of the testator controls] which is sacred to our way of life and fundamental in our concepts of right and justice." *Id.* at 452.

In exercising our duty to determine whether a common law crime presently exists in this State, mere non-use is not sufficient, as we have indicated, to conclude that the offense has become obsolete. But non-use, we believe, is not without significance. When an offense has lain virtually dormant for over two hundred years, it is difficult to argue that the preservation of society and the maintenance of law and order demand recognition of it. *See* Glazebrook, *How Long, Then, Is The Arm Of The Law To Be?,* 25 Mod. L. Rev. 301, 307-311 (1962). Perkins points out:

> "The notion that misprision is needed, to prevent one who knows about another's felony from intentionally misleading investigating officers, is unfounded. If, when being questioned by officers who are investigating a felony, one who knows the facts intentionally misleads the officers by false statements and thereby 'covers up' for the felon, he thereby makes himself an accessory to that felony after the fact. If he impedes the investigation by falsely saying he does not know about it, or by refusing to talk, he should be held to be guilty of obstructing justice. There is a wide difference between a mere failure to hunt up an officer and tell about a felony, on the one hand, and a refusal to cooperate with an investigating officer, on the other." R. Perkins, Criminal Law 517 (2d ed. 1969).

Even more relevant, however, to a consideration of whether a common law crime is applicable as compatible with our local circumstances and situation and our general codes of law and jurisprudence is the nature of the crime. The reason for the failure of common law misprision of felony to survive in the United States waş well expressed by Chief Justice Marshall over a hundred and fifty years ago in *Marbury v. Brooks,* 20 U. S. (7 Wheat.) 556, 575-576 (1822) and thereafter noted by many commentators, text book authors and other authorities:

> "It may be the duty of a citizen to accuse every offender, and to proclaim every offence which comes to his knowledge; but the law which would punish him in every case for not performing this duty is too harsh for man."

In England, according to Glazebrook in his critical consideration of *Sykes v. Director of Public Prosecutions, supra,* in 25 Mod. L. Rev. 301, the Criminal Law Commissioners in their Fifth Report in 1840 repeated and elaborated this criticism and observed:

> " 'The necessity of making such disclosures extends perhaps with greater force to the knowledge of a meditated crime, the perpetration of which may, by means of such disclosure, be prevented, than it does to the knowledge of one already committed.' " *Id.* at 301, citing, n. 3, "Parl. Pap. (1840) xx, p. 32; quoted, Williams, *The Criminal Law: The General Part* (2nd ed., London 1961), p. 423."

Glazebrook opined that "[f]or more than a century misprision of felony has been an embarrassment to common lawyers," and feared that the decisions and speeches in the House of Lords in *Sykes* "afford only increased cause for this embarrassment." *Id.* at 301. The Court of Special Appeals relied on *Sykes* in holding that misprision of felony, as *Sykes* found it existed at common law, was currently an indictable crime in Maryland.[26] Glazebrook ably refuted *Sykes,* and we borrow extensively from him in the discussion which follows.

---

26. The Court of Special Appeals recognized that it was "not bound by current opinion of the House of Lords," but noted that "its view of what

Misprision of felony at common law is an impractically wide crime, a long-standing criticism which remains unanswered in *Sykes.* It has an undesirable and indiscriminating width:

> "The real harshness lies in the fact that the duty to disclose arises when a person acquires knowledge of an offence, and this he may do quite involuntarily. A says to B: 'Did you know that X stole a book from the library last week?' adding appropriate circumstantial details; or X says to B: 'I stole some money yesterday; will you help me to repay it?' B is a friend of X; he wished to know nothing of X's misdeeds; and yet he is to be a criminal if he does not betray him. It is, furthermore, particularly difficult to defend a law which indiscriminately adds to the injuries of the victim of a crime the penalties of the criminal law should he or she wish to forgive and forget." 25 Mod. L. Rev. at 311.

Misprision differs from almost all other common law offenses of omission:

> "[T]he duty to act arises not because of the willing assumption of responsibility, the occupation of an office, or the ownership of property, but because of the mere possession of certain knowledge — knowledge possessed accidentally and undesired — knowledge which may indeed have been acquired through some malevolent person." *Id.*

Glazebrook observes that although "[t]here may be crimes where the protection of the public requires that each offender be brought to justice however reluctant his victims, his friends, or those who have him in their care, may be to do so, ... the line which separates them from all other offences is not the line which separates felonies from misdemeanors." *Id.*

---

comprised the elements of its common law prior to 1776 is hard to gainsay." Pope v. State, 38 Md. App. 520, 530, 382 A. 2d 880 (1978). It continued: "If in the application of that common law, active concealment is found to be more contemporarily compatible to a determination of criminal culpability than is indifference, such policy is for our Legislature or Court of Appeals to say." *Id.*

at 312. This is particularly true with respect to Maryland where the distinction between felony and misdemeanor is a hodgepodge, following neither rhyme nor reason.

Under *Sykes,* no active step need be taken to conceal the felony (it is only thus that it remains quite distinct from the crime of accessory after the fact), and the concealment need bring no benefit to the accused.[27] But three fundamental questions remained: when does the duty to reveal a felony arise; how is that duty discharged; and does a relationship with the felon prevent the duty arising? [28]

It seems that the duty arises when "a man knows" of the commission of a felony. When, then, can a man, be said to *know* and *what* is it that he must know? Lord Goddard held that there must be disclosure when the knowledge a man has "is so definite that it ought to be disclosed. A man is neither bound nor would he be wise to disclose rumours or mere gossip, but, if facts are within his knowledge that would materially assist in the detection and arrest of a felon, he must disclose them as it is a duty he owes to the state." *Sykes* at 46. Lord Goddard left the matter to the jury as a question of fact. Glazebrook suggests that "unless the jury is to be entirely uncontrolled, it has to be told how precise and certain the accused's knowledge must have been before he can be convicted." 25 Mod. L. Rev. at 313. Is the duty to be confined to felonies committed in the presence of the accused, and, if not, is hearsay sufficient? Should the felon's own admission, standing alone, be enough? Knowledge of the commission of a crime is an ingredient of the offenses of accessory after the fact and receiving stolen goods, but, unlike misprision, they require a positive act. It is reasonable, in such circumstance, to require a person who has reason to believe something is

---

27. The question whether the offense extended to concealing knowledge of an intended felony was left open.

28. Glazebrook observed that the absence of substantial authority by way of reported cases seriously handicapped their lordships in justifying the law, not only in freeing it from the criticism that it was impossibly wide in scope, but also in determining its ingredients. 25 Mod. L. Rev. 301, 307. ". . . Lord Denning was driven to the curious position of stating that 'the ingredients of the offence can best be seen by comparing it with offences of like degree which have *other* ingredients.' His lordship might, with equal logic, have postulated crimes of fornication or adultery, and then·determined their elements by examining the offences of rape, incest and buggery." *Id.* at 312.

wrong to inquire further before embarking on some course of conduct, and to hold that he fails to do so at his peril. "If this rule is applied to misprision, two duties are imposed: a duty to disclose knowledge of a felony, and a duty also to make inquiries to resolve a suspicion concerning the commission of a felony." *Id.* To paraphrase Glazebrook, must the inhabitants of Maryland become detectives as well as informers?

*Sykes* fails to provide a working rule for *what* the accused must know. There was a direct conflict between Lord Denning and Lord Morton into which their brethren did not enter. Discussing knowledge, Lord Denning said:

> "The accused man must know· that a felony has been committed by someone else. His knowledge must be proved in the way in which the prosecution have been accustomed in other crimes when knowledge is an ingredient, such as receiving, accessory after the fact, compounding a felony, and so forth. That is to say, there must be evidence that a reasonable man in his place, with such facts and information before him as the accused had, would have known that a felony had been committed. From such evidence the jury may infer that the accused man himself had knowledge of it. He need not know the difference between felony and misdemeanour — many a lawyer has to look in the books for the purpose. . . ." *Sykes* at 41.

Glazebrook comments: "This leaves it largely a matter of chance whether misprision is committed or not." 25 Mod. L. Rev. at 314. That is, on the one hand, it must have been a felony of which the accused knew, but on the other hand, he need not know whether the crime was a felony or a misdemeanor. According to Lord Denning, it would be enough that the accused knew that a *serious* offense had been committed if it turns out to be a felony — "a lawyer on turning up the books sees it is a felony. . . ."

> "This requirement that it must be a serious offence disposes of many of the supposed absurdities, such

> as boys stealing apples, which many laymen would . rank as a misdemeanour and no one would think he was bound to report to the police. It means that misprision comprehends an offence which is of so serious a character that an ordinary law-abiding citizen would realise he ought to report it to the police." *Sykes* at 42.

This rationale was based on the view that what distinguishes a felony from a misdemeanor is that a felony is a serious offense, "an offence of an 'aggravated complexion'.... Felonies are the serious offences. Misdemeanours are the less serious." *Id.* This introduced a limitation Lord Morton was not willing to accept. *Id.* at 46-47. In any event, the limitation added the further uncertainty of a trier of fact's view of the gravity of the crime to be reported. 25 Mod. L. Rev. at 314. And, we observe, the foundation for the limitation is weak indeed when considered in light of the categories of felonies and misdemeanors adopted in this State. *Sykes* avoids what account is to be taken of excuses offered by an apparent felon. For example, "[i]n cases of larceny, may the citizen be satisfied by any claim of right that is made, or must it be weighed, and where suspicion remains this communicated to the police? . . . The [*Sykes*] recognition of misprision means, therefore, the imposition not of a duty to disclose *knowledge* of the commission of a felony, but of a duty to disclose *suspicions* of the commission of a felony. . . ." *Id.* at 314-315. There are no criteria for determining which suspicions are to give rise to a duty, and so to criminal liability.

When the duty to disclose has arisen, it is not clear how it is discharged. It would be logical that once the authorities are in possession of all the information concerning a felony, a citizen's duty to disclose his own knowledge ceases. So there is an added element of chance — "the chance that the police already know." *Id.* at 315. Lord Denning saw the duty as requiring a citizen "to disclose to proper authority all material facts known to him relative to the offence. It is not sufficient to tell the police that a felony has been committed. He must

tell the name of the man who did it, if he knows it; [29] the place, and so forth. All material facts known to him. . . . If he fails or refuses to perform this duty when there is a reasonable opportunity available to him to do so, then he is guilty of misprision." *Sykes* at 42. This was not sufficient for Lord Goddard. He thought that "facts ... within his knowledge that would materially assist in the detection and arrest of a felon" must be disclosed as a duty owed to the State. *Id.* at 46. "Thus if a man disclosed all he knew about the commission of a felony and yet did not disclose the whereabouts of the felon he would be acquitted by Lord Denning and convicted by Lord Goddard." 25 Mod. L. Rev. at 315.

Their lordships agreed that the questions of when the knowledge must be revealed and how much trouble must be taken to reveal it were for the jury. Glazebrook is critical of this as assigning unsuitably vague questions to the trier of fact:

> "If a man is to be punished for not doing something, he ought to know precisely what is expected of him. The standard which he fails at his peril to attain ought not to be left to be fixed after the event by the whim of a particular jury. Formulae that pass muster in determining the liability of one who engages in a dangerous course of conduct are not always suited to crimes of pure omission." *Id.* at 316.

Only Lord Denning considered relationship with the felon with respect to the duty to disclose:

> "Non-disclosure may be due to a claim of right made in good faith. For instance, if a lawyer is told by his client that he has committed a felony, it would be no misprision in the lawyer not to report it to the police, for he might in good faith claim that he was under a duty to keep it confidential. Likewise with doctor

---

**29.** It is difficult to see how even a reasonable man could know that a felony had been committed if he does not know the felon. "He has to make certain assumptions about the perpetrator's *mens rea* and this he cannot do if he does not know who he is." 25 Mod. L. Rev. at 315, n. 91.

and patient, and clergyman and parishioner. There are other relationships which may give rise to a claim in good faith that it is in the public interest not to disclose it. For instance, if an employer discovers that his servant has been stealing from the till, he might well be justified in giving him another chance rather than reporting him to the police. Likewise with the master of a college and a student. But close family or personal ties will not suffice where the offence is of so serious a character that it ought to be reported." *Sykes* at 42.

Glazebrook finds this to be "a singularly unhappy instance of creative judicial activity, for a defence grounded on a 'claim of right made in good faith' is in this context inapt, and the choice of relationship perverse." 25 Mod. L. R. at 317. He explains:

"A person advancing a defence of 'claim of right' pleads that he mistakenly thought that the law recognised in him a right to act in the way he did. If his defence is accepted, his mistake will be benevolently viewed, and he is excepted from criminal liability. The defence is thus founded on the mistake, on the *claim,* not the *right,* and disappears when the mistake is corrected. . . . In short, if the crime is to be limited, there must be a categorical rule that doctors and the like are under no duty to disclose their patients' felonies." *Id.*

As to the choice of exempt relationships

"[t]he exclusion in misprision of 'close family or personal ties' is utterly callous and certainly futile: how can the relation between doctor and patient, an employer and his servant, be thought more sacred, more deserving of respect and consideration — even by the law — than that between husband and wife, between father and son? By what standard is it unreasonable to expect an employer to report his servant's crimes to the police, and yet proper that a son should betray his father?" *Id.* at 318.

We observe that common law misprision is not only beset with practical defects but may implicate constitutional privileges. To sustain the Fifth Amendment right against self-incrimination,[30] "it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer ... might be dangerous because injurious disclosure might result." *Hoffman v. United States,* 341 U. S. 479, 486-487, 71 S. Ct. 814 (1951). The privilege extends not only to information that would itself support a conviction, but "likewise embraces those which would furnish a link in the chain of evidence to prosecute the claimant...." *Id.* at 486. *See United States v. King,* 402 F. 2d 694 (9th Cir. 1968), reversing conviction of federal misprision on Fifth Amendment grounds. We note also that it has been suggested that the federal misprision statute may involve the right of privacy. In *United States v. Worcester,* 190 F. Supp. 548, 566 (D. Mass. 1961), Judge Wyzanski, discussing the federal statute, said:

> "To suppose that Congress reached every failure to disclose a known federal crime, in this day of myriad federal tax statutes and regulatory laws, would impose a vast and unmeasurable obligation. It would do violence to the unspoken principle of the criminal law that 'as far as possible privacy should be respected.' There is 'a strong reluctance on the part of judges and legislators to sanction invasion of privacy in the detection of crime.' There is 'a general sentiment that the right to privacy is something to be put in balance against the enforcement of the law.' Sir Patrick Devlin, The Enforcement of Morals, p. 19."

*See* Shannonhouse, *Misprision of a Federal Felony: Dangerous Relic or Scourge of Malfeasance,* 4 U. Balt. L. Rev. 59 (1974), calling for "excisement from the criminal code" of the federal crime. *Compare* Goldberg, *Misprision of Felony: An Old Concept in New Context,* 52 A.B.A.J. 148

---

30. "No person ... shall be compelled in any criminal case to be a witness against himself...." U. S. Const. amend. V.

(1966), and Comment, *Misprision of Felony: A Crime Whose Time Has Come, Again,* 28 U. Fla. L. Rev. 199 (1975).

We have proceeded on the assumption that the House of Lords was correct in concluding in *Sykes* that "there is and always has 'been an offense of misprision of felony...." *Sykes* at 40. We are persuaded, finding no sound reason not to be, that their lordships' definition of the offense and the composition of its elements properly reflected the crime as it existed at common law. We are satisfied, considering its origin, the impractical and indiscriminate width of its scope, its other obvious deficiencies, and its long non-use, that it is not now compatible with our local circumstances and situation and our general code of laws and jurisprudence. Maintenance of law and order does not demand its application, and, overall, the welfare of the inhabitants of Maryland and society as enjoyed by us today, would not be served by it. If the Legislature finds it advisable that the people be obligated under peril of criminal penalty to disclose knowledge of criminal acts, it is, of course, free to create an offense to that end, within constitutional limitations, and, hopefully, with adequate safeguards.[31] We believe that the common law offense is not acceptable by today's standards, and we are not free to usurp the power of the General Assembly by attempting to fashion one that would be. We hold that misprision of felony is not a chargeable offense in Maryland.

## III

We have reversed Pope's conviction of the felony of child abuse because the evidence was insufficient to sustain the verdict. She may not be tried again for that crime. *Burks v. United States,* 437 U. S. 1, 98 S. Ct. 2141 (1978); *Greene v.*

---

**31.** The child abuse law requires "[e]very health practitioner, educator, or social worker or law-enforcement officer, who contacts, examines, attends, or treats a child and who believes or has reason to believe that the child has been abused ... to make a report ... notwithstanding any other section of the law relating to privileged communications...." Code (1957, 1976 Repl. Vol.) art. 27, § 35A (c). It further requires any person, other than those specified in § 35A (c), "who has reason to believe a child is abused [to] so report to the local department of social services or to the appropriate law-enforcement agency...." § 35A (e). There is no sanction for failure to comply, but immunity from civil or criminal penalty is provided when there is compliance. § 35A (h).

*Massey,* 437 U. S. 19, 98 S. Ct. 2151 (1978); *Mackall v. State,* 283 Md. 100, 387 A. 2d 762 (1978).

As we have held that the crime of misprision of felony does not now exist in Maryland, Pope may not, of course, be retried on a charge of that crime.

## IV

Pope moved that we strike from the State's brief and appendix a selection from the Year Book of 1484 written in Medieval Latin and references thereto. The State provided no translation and conceded a total lack of knowledge of what it meant. The motion is granted.

Pope had the selection translated at a cost of $150. She further moves this Court to order the Office of the Attorney General to reimburse the Office of the Public Defender for the cost of the translation. Pope undertook to have the selection translated on her own initiative. The motion is denied.

> *Judgment of the Court of Special Appeals with respect to child abuse, third count of Indictment No. 18666, reversing the judgment of the Circuit Court for Montgomery County, affirmed; judgments of the Court of Special Appeals with respect to misprision of felony, fifth count of Indictment No. 18666, affirming the judgment of the Circuit Court for Montgomery County, reversed; case remanded to Court of Special Appeals with direction to remand to the Circuit Court for Montgomery County for entry of judgment of acquittal on the third count and dismissal of the fifth count; motion of appellant to strike granted; motion of appellant for appropriate relief denied; costs to be paid by Montgomery County.*

*Eldridge, J., concurring in part and dissenting in part.*

I concur in that portion of the Court's opinion relating to the crime of misprision of a felony. I also agree with the majority that Pope was not guilty of child abuse as a principal in the second degree. However, I cannot agree with the majority's restrictive interpretation of the child abuse statute, which interpretation furnishes the basis for the majority's conclusion that Pope was not guilty of child abuse as a principal in the first degree.

The child abuse statute, Maryland Code (1957, 1976 Repl. Vol.), Art. 27, § 35A (a), reaches "[a]ny parent, adoptive parent or other person who has the permanent or temporary care or custody or responsibility for the supervision of a minor child. . . ." The Court today takes the position that the statutory phrase "has responsibility for the supervision of" is ambiguous, thereby allowing the Court to "give effect to the real intention of the Legislature." The majority then states that, with regard to persons other than parents, legal custodians or individuals "in loco parentis," only those persons who have assumed responsibility for a child with the consent of the parent or guardian are covered by the statute. The majority finds it "self-evident" that "a third person may not assume such responsibility unless the parent grants it."

Thus, we are told by the majority opinion that a "person taking a lost child into his home" while an attempt is made to locate his or her parents is beyond the reach of the child abuse statute. In other words, in the Court's view, such a person may voluntarily assume full responsibility for the care of a small child, for a lengthy period of time while an effort is being made to find the parents, and during that time may batter the child unmercifully, but he would not be guilty of child abuse under Art. 27, § 35A. In my view this is a totally unwarranted narrowing of an important piece of legislation.

In addition to parents, the child abuse statute applies to "[a]ny . . . other person who has . . . responsibility for the supervision of a minor child. . . ." The language is clear. Everyone who has responsibility is covered, regardless of how he obtained such responsibility.

It is well-established in the law that one may, by his own actions, voluntarily assume a particular responsibility. That the Legislature intended to cover such a person is shown by the language *any other person who has responsibility.* There is no ambiguity here. Consequently, there is no need to go further in attempting to ascertain the legislative intent. The majority opinion today flatly violates settled principles of statutory construction, recently summarized by Judge Orth for the Court as follows (*Wheeler v. State,* 281 Md. 593, 596, 380 A. 2d 1052, 1054-1055 (1977), *cert. denied,* 435 U. S. 997, 98 S. Ct. 1650, 56 L.Ed.2d 86 (1978)):

> "The cardinal rule of statutory construction is to ascertain and carry out the real legislative intention. *Balto. Gas & Elect. Co. v. Board,* 278 Md. 26, 31, 358 A. 2d 241 (1976). A statute should be construed according to the ordinary and natural import of the language used without resorting to subtle or forced interpretations for the purpose of limiting or extending its operation. *Burch v. State,* 278 Md. 426, 429, 365 A. 2d 577 (1976); *Cearfoss v. State,* 42 Md. 403, 407 (1875). That is, we must confine ourselves to the statute as written, and may not attempt, under the guise of construction, to supply omissions or remedy possible defects in the statute. *In Re Appeals Nos. 1022 & 1081,* 278 Md. 174, 178, 359 A. 2d 556 (1976). Thus, if there is no ambiguity or obscurity in the language of a statute, there is usually no need to look elsewhere to ascertain the intent of the Legislature. *Maryland Auto Ins. Fund v. Stith,* 277 Md. 595, 597, 356 A. 2d 272 (1976). As we said in *Purifoy v. Merc.-Safe Dep. & Trust,* 273 Md. 58, 66, 327 A. 2d 483 (1974), 'where statutory language is plain and free from ambiguity and expresses a definite and sensible meaning, courts are not at liberty to disregard the natural import of words with a view toward making the statute express an intention which is different from its plain meaning.' "

Furthermore, even if there existed some ambiguity in the statute, I am at a loss to know why the majority finds it "self-evident" that only those persons who have been *granted* responsibility by a parent or guardian should be covered. Nothing in the statutory language indicates such a legislative purpose. I know of no public policy justifying this differentiation between a person who assumes responsibility for a child with parental consent and one who assumes just as complete a responsibility without the parent's consent. If either abuses the child, he should be held accountable under § 35A.

The majority appears to be concerned about the "good samaritans" who watch a lost child, or allow neighbors' children to play in their yards and exercise supervision, or perform "functions of a maternal nature from concern for the welfare, comfort or health of a child." However, such "good samaritans" have nothing to fear from the child abuse statute. But, if one of these same individuals assumes responsibility for the child and batters it, sexually molests it, locks it for a long period of time in a dark closet, etc., that person should be held just as accountable under the child abuse statute as someone else having responsibility for the child.

My concern in this case is not so much with the decision that the evidence was insufficient to convict Pope of child abuse. The evidence may not have been sufficient. Instead, what is troublesome in this case is the damage which the majority has done to the child abuse statute.