80 So.2d 446 (1955)
Henry W. MORGENTHALER, Jr., joined by Elizabeth Taylor Morgenthaler, his wife, and David Turner Morgenthaler, their son, Petitioners, and Joseph E. Morgenthaler, Petitioner, Appellants,
v.
FIRST ATLANTIC NATIONAL BANK OF DAYTONA BEACH, Florida, as Executor, Appellee.
Supreme Court of Florida. Division A.
May 18, 1955.
*447 Edward L. Semple, Miami, for appellants.
Cobb & Cole, Daytona Beach, for appellee.
DREW, Chief Justice.
We preface this opinion with the observation that our task in this case  involving as it does  a difficult question that this court has never decided, has been simplified, and we have been greatly assisted by the concise, logical and ably prepared briefs of counsel for both parties as well as a record embracing only essential matters.
We are concerned here with the will of Sophia Morgenthaler dated June 5, 1935, (hereinafter referred to as the "will") and the codicil thereto dated September 10, 1949, (hereafter referred to as the "codicil"). The codicil of April 3, 1952, is not directly involved in the question before us.
The original will devised the residue of the estate to a trustee. Broad powers were given the trustee with reference to the management and investment of said residue. The portions of the will pertinent to *448 the issue now under consideration are embraced in paragraph Fourth[1] and in paragraph Four of the codicil along with the explanation or introductory portion thereof.[2] *449 Sophia's sister Rose, as is apparent from paragraph one of the codicil predeceased Sophia.
A little while after the death of Sophia, her nephew, Henry W. Morgenthaler, Jr., joined by his wife, Elizabeth, and his son *450 David, and another nephew, Joseph E. Morgenthaler, (two of the nephews provided with annuities in the will and codicil) filed, separately, petitions before the probate Judge entitled "Petitioners' Election to Take Corpus of Estate instead of Annuity." The prayers of the petitions were substantially the same.[3]
The Probate Judge disagreed with petitioners' contention that they were the unqualified and absolute owners of the corpus of the estate to be used to purchase the annuities, but held that in purchasing said annuities the executor or trustee "shall so contract with the Life Insurance Company or Companies, selected to write said annuities, that there will be no restrictions on the petitioners, or either of them, in the matter of sale, transfer, mortgage, hypothecation, or similar handling, of said annuities subsequent to the time they are received by petitioners, except that in the case of Henry W. Morgenthaler, Jr., said annuity contract or contracts shall provide that upon his death the unused portion of that annuity shall be paid over unto his wife, Elizabeth Taylor Morgenthaler and his son, David Turner Morgenthaler, share and share alike, or to the survivor of them, in the event the other shall have passed on prior to the decease of said Henry W. Morgenthaler, Jr."
On appeal and cross appeal to the Circuit Court, that court affirmed the Probate Judge on his holding concerning the ownership of the corpus but reversed him on the proposition quoted above. It is the decree of the Circuit Judge that we now have before us on the appeal of the petitioners in the Probate Court. Hereafter we shall refer to them as the appellants. The executor and trustee we shall call appellee.
Two questions are presented here. Both the appellants and the appellee agree that the first is: "Where a testator directed an executor to purchase for a beneficiary a `full refund life annuity' in a responsible life insurance company upon a contract to pay to said beneficiary a monthly annuity in as large amount as the fund will purchase, with the proviso in the contract that the unused portion, upon the death of the annuitant, be paid over to persons to whom it is directed to be paid by such annuitant, is not the beneficiary entitled to elect and to receive the corpus of the estate in lieu of such annuity?"
Appellants argue  and not without considerable force and persuasion and upon respectable authority  that the answer must be in the affirmative because, under the common law in force July 4, 1776[4], and at all times since then, a bequest of money *451 to be used in the purchase of an annuity gives the legatee a right to the money and he can insist that the annuity shall not be bought.[5] Appellee agrees that this is a correct statement of the later holdings of the English Courts. It is commonly called the English rule. Appellants argue that this rule has been the law of England and hence a part of the common law since the case of Yates v. Compton, 2 P.Wms. 308, decided in 1725; but appellee says that Yates v. Compton, supra, does not decide this point at all and that the first English case to support appellants' contention was that of Barnes v. Rowley, 3 Ves.Jr. 305, decided in 1797. Thus, there is present here, among other questions, a dispute as to the status of the common law on this point on July 4, 1776. This question is intriguing, but for the reasons hereafter expressed, we find no necessity for pursuing it. Further developing appellants' theory and using their premise, arguendo, that the common law in force July 4, 1776, became a part of the law of Florida and was the law in this state at all times pertinent to this case, they say that such law governed the question and that we are bound to honor it under the rule of stare decisis.
Appellee counters with the proposition that, with the exception of Massachusetts[6] and New York[7], every common-law state where the question has arisen has rejected the English rule and adopted the American rule which gives effect to the testator's intention as expressed in the will.[8] Summarized, appellee says the American rule is the proper rule because
(1) It is consistent with the respect which our American Courts have always shown for the intention of the testator.
(2) The English rule is not part of the common law that we inherited from that nation.
(3) The English rule is arbitrary, and to follow it would be at the expense of justice.
(4) The reason for the English rule, that it is useless to purchase an annuity because the legatee might immediately sell his annuity at substantially the amount of the purchase price of the annuity does not exist. It is not true that a legatee by the sale of an annuity will be able to "receive substantially the amount of the purchase price of the annuity."
The plain language of the will and codicil convinces us that it was the clear intention of Sophia Morgenthaler to provide an income to her nephews, who bore her name, during their lifetime, in an amount  as she said in the preface to the codicil  "sufficient to maintain the average individual." *452 It is equally clear that to accomplish this purpose she directed her trustee to purchase the annuities. We think it is also clear that it was her desire that these nephews should not be privileged to receive the corpus at their behest or request. Both the Probate Judge and the Circuit Judge reach these same conclusions and appellants with commendable frankness do not argue to the contrary. The simple question then, on this issue, is whether we shall honor the plain intent of the testator or disregard that intent as the English courts and the Massachusetts and New York courts have done on the theory that the courts would not compel an executor to perform an act which would be entirely nugatory.[9]
From the beginning this court has undeviatingly held to the view that in construing wills its guide and polar star is the intent of the testator. The cases of this court affirming this proposition are legion. There is no higher duty nor greater responsibility on the courts than that of seeing to it, in proper cases, that the will of the dead is honored. Knowledge in the living that this will be done affords a marked degree of solace and comfort in the afternoon and evening of life. One possessed of his normal faculties, may, during his lifetime dispose of his own possessions as he pleases. He may, if he chooses, drop his wealth to the bottom of the sea and no man can restrain him. Why, then, should he not be allowed so to dispose of his wealth after his death where the manner in which he does so is not unlawful or contrary to the public policy of the State?
Accepting the premise, then, that our paramount duty is to lend our arm to effectuating the plain intent of the testatrix that her nephews receive the annuity for their life and without power to sell or dispose of it  such intention being unchallenged  does the so-called English rule require us to hold contrary? We think not.
We doubt that the law of England, on July 4, 1776, on the question was crystallized to the point that it could be said that on that date it was the common law of England of a general nature. But even if it were, we are not bound to adhere if we should determine that such rule dethrones a principle which is sacred to our way of life and fundamental in our concepts of right and justice. We have never hesitated, in proper cases, to overrule our own precedents where to do otherwise would result in injustice and oppression or perpetuate a palpably erroneous decision. Why, then, should we hesitate to recede from or refuse to follow a common-law concept which we have never judicially recognized or sanctioned?
In Layne v. Tribune Co., 108 Fla. 177, 146 So. 234, 237, 86 A.L.R. 466, 472, speaking through the late Chief Justice Davis, we said:
"Courts of justice are bound by the rule of stare decisis to follow the common law as it has been judicially declared *453 in previously adjudicated cases. And the courts as such have no inherent right to revise or amend the settled rules of the common law to suit their own ideas of wherein the law should be modernized by amendments which would overturn long standing precedents. But it does not follow from what has been said in this regard, that the courts are wholly powerless to remold and reapply the ancient rules so as to fit them to modern conditions, where there has arisen and become involved, new factors of life and business arising from the complexities of mechanized era of human progress. And indeed it is the duty of the courts to do so in cases appropriately calling for a modern application of ancient precepts to new facts of human experience in an advancing civilization."
Much more could be written here but other courts have already said all we could say.[10] We choose to follow the rule that honors the wishes of the testator.
We now turn to the second question.
This question arises out of that portion of the order of the Probate Judge (reversed by the Circuit Judge) which we have quoted in the fifth paragraph of this opinion. Having determined that the first question was correctly answered by both the Probate Court and the Circuit Court we can see little point in laboring  to any considerable extent  the second question. Appellants argue that inasmuch as "there is no direction (in the will) or prohibition or restriction upon the sale, transfer, mortgaging or similar handling of the annuity" the court should order the executor, when purchasing such annuity, to arrange that the contract should not contain any provision against sale, transfer, assignment or like disposition.[11] On the other hand the appellee says that it is clear from the will that such provision for the purchase of the annuity was a continuation of the plan disclosed by the will for furnishing a lifetime income to her nephews and that the court should order that the contract include what would be tantamount to a spendthrift clause.
We agree with appellee.
In view of what we have said in this opinion concerning our duty to honor the will of the deceased, had the codicil expressly provided as to appellants, as the will did in a New Jersey case[12] about a wife for whom an annuity was to be purchased: "`I further direct that in no event shall my said wife be permitted to elect to take a capital sum in lieu thereof'", there could be no doubt about our answer to this problem. The lack of such express language, however, should cause no concern. A study of the will and codicil leaves not a shred of doubt in our minds that Sophia's intention was that her nephews were not to be allowed to receive the principal during their lifetime. If she had intended otherwise all the provisions relating to the annuity were a complete idle gesture and accomplished absolutely nothing.
The method pursued by Sophia to insure a lifetime income to her nephews by the purchase of annuities was obviously adopted to save the expense and complications of depositing such funds with a trustee.[13] She had the right to provide that her residue should be handled in this manner, and it would plainly defeat what she attempted to accomplish if the nephews were enabled to take the cash instead of the annuity. We think  and hold  that it is the duty of the executor to carry out the intention of the testator and to that end to see that, *454 when he purchases each annuity, the contract is so worded that annuitants may not defeat the plan of the testator.
Affirmed.
TERRELL, SEBRING and ROBERTS, JJ., concur.
NOTES
[1] "Fourth All of the rest, residue and remainder of my estate then remaining shall be considered as a trust estate and, as such, I hereby give, devise and bequeath the same unto my Trustee hereinafter named, in trust, to be joined and comingled with that certain trust estate created by the Last Will and Testament of my said sister, Rose Morgenthaler, executed simultaneously herewith, for the following uses, purposes and benefits, namely:

"(a) That said Trustee shall manage and control said trust estate and proceed to collect all rents, issues, profits, interest, dividends or accretions arising therefrom, and said Trustee shall have full right and authority to sell and dispose of any part of said trust estate and to give good and effectual deeds, bills of sale, assignments or other conveyances, releases or satisfactions, with full power of substitution of securities, if in the discretion of said Trustee it may deem most advisable or advantageous to the best interests of said estate at any time during the period of said trust, and out of the income of said joined trust estates, shall pay the sum of One Hundred ($100.00) Dollars in cash each month during the period of the trust, as hereinafter specified, to the following named persons, viz.:
"(1) Henry W. Morgenthaler, Jr., his wife and son, my nephew, now residing at Coral Gables, Florida.
"(2) Daniel C. Morgenthaler, my nephew, now residing at 3281 Observatory Road, Cincinnati, Ohio.
"(3) Joseph E. Morgenthaler, solely, my nephew, now residing at 71 Park Avenue, New York City.
"(4) Margaret Linn Pritchard, always considered by me the same as my niece, now residing at 129 Cumberland Avenue, Asheville, North Carolina;
provided that if the total net income of said joined trust estates shall be insufficient to pay the said sum of One Hundred ($100.00) Dollars monthly to each of said beneficiaries above named, then the whole of said net income from said joined trust estate shall, each month during the period of said trust be equally divided and paid to said beneficiaries above named, share and share alike, in equal parts, it being my intention that the separate income from said property shall not be segregated or a separate account thereof kept, but that the same shall be co-mingled and joined with the income from the property of my said sister, so joined in said trust, so that said monthly payments are hereinabove provided, out of the income from said joined trust estates, may be paid to each of said beneficiaries as above stated.
"(b) If either of said beneficiaries hereinabove lastly named shall not be living at the time of my death or shall die following my death, before the termination of said trust, then it is my will that the said amount so willed to be paid monthly from said joined trust estate income to any such deceased beneficiary shall thereafter be paid, for the term of said trust, to the bodily heirs of such deceased beneficiary, if such beneficiary leaves bodily heirs, share and share alike, and if there be no such bodily heirs surviving, then such bequest to abate.
"(c) That it is my will that the term of said trust period shall be for the period of three years from and after the date of my death, or for the same period of time following the death of my sister, Rose Morgenthaler, if she shall survive me, during which time I direct that said Trustee shall carefully conserve said trust estate and convert the same into cash at the best market price or prices obtainable and consistent with sound trust management within the sole discretion of said Trustee, to the end that at the termination of said trust period the entire trust estate will be converted into cash, available for use in the purchase of annuities, as hereinafter provided.
"(e) That at the termination of said trust period, after the payment of said specific bequests, said Trustee shall apply the entire net proceeds of said joined trust estates then remaining in the purchase of separate life annuities for each of said beneficiaries hereinabove in Item Fourth (a) specifically named, then living, in responsible life insurance companies, upon annuity contracts for each of said beneficiaries respectively, to pay to each of said beneficiaries a monthly annuity of One Hundred ($100.00) Dollars each month during the remainder of the lives of each of said beneficiaries respectively with the proviso in each of said annuity contracts that the remainder or unused portion of said annuity amounts so paid by said Trustee into the hands of such insurance company in the establishment of said respective annuities, shall, upon the death of each of said respective annuitants, be paid over unto the heirs at law in being at the time of the death of each of said annuitants respectively. If either of said beneficiaries shall not be living at the time of the termination of said trust period, then it is my will that the share or portion of said net proceeds of said joined trust estate that would have been applied by said Trustee in the purchase of a life annuity for said beneficiary shall, in lieu thereof, be paid over to the heirs at law in being at the expiration of said trust, in equal parts share and share alike."
[2] Pertinent parts of the codicil are as follows:

"My Will was executed as a reciprocal will with that of my sister, Rose Morgenthaler, said wills being identical in most of the material respects, and providing for the comingling of our separate estates upon the death of the survivor.
"When these wills were written, the economy of this country was at a very low level, and the sum of One Hundred ($100.00) Dollars per month as an annuity was considered sufficient to maintain the average individual. Since that time, living costs have increased tremendously, and the dollar has shrunk to a very low estate. The value of the securities comprising our estate has likewise increased to a point undreamed of by either my sister or myself, at the time our wills were executed.
"During the past few years, when the inequity of the final disposition of our estates has become so readily apparent, I have been most dissatisfied with the plan set out in our wills. Although it was our intention to dispose of our property in accordance with a plan mutually agreed upon, there was no contract between my sister and me to that effect. What I am about to do, in the changing of my will, I fully believe would be in accordance with my sister's wishes were she alive and cognizant of present circumstances. I am giving her credit for the intelligence I knew her to possess. Accordingly, it is my will that my Last Will and Testament be changed in the following respects, viz.:
"One. As my sister has predeceased me. Item Second is no longer operative.
* * * * *
"Four. The fourth item of my will provides for monthly payments to my four beneficiaries, or their bodily heirs, during the period of trust administration, set at three years following my death. It was our intention that our Trustee should have some discretion about the time required to liquidate our estates, and as for my portion, I direct that my Trustee proceed to liquidation and settlement as rapidly as possible, consistent with sound judgment and trust management. It is now quite apparent that the value of my estate is considerable greater now than at the time of the execution of my will, and as it is my desire to provide, primarily for such of my residuary beneficiaries as may be living at the time of my decease, I direct that sub-paragraph (e) of Item Fourth be canceled, and that the following be substituted in lieu thereof:
"Fourth: (e) That at the termination of said trust period, after the payment of said specific bequest, said Trustee shall apply the entire net proceeds of my separate estate then remaining to the purchase of separate full refund life annuities for each of said beneficiaries hereinbefore named, then living, in responsible life insurance companies, upon annuity contracts for each of said beneficiaries respectively, to pay to each of said beneficiaries a monthly annuity in as large amount as said fund will purchase, during the remainder of the lives of each of said beneficiaries respectively, with the proviso in each of said annuity contracts that the remainder or unused portion of said annuity amounts so paid by said Trustee into the hands of such insurance company in the establishment of said respective annuities, shall, upon the death of each respective annuitant, be paid over to such persons as said beneficiaries, respectively, shall appoint, provided that Henry W. Morgenthaler, Jr., shall appoint his wife and son, David, or the survivor of them, to receive the remainder from his annuity, share and share alike, if they be living at the time of his death, and that Margaret Linn Pritchard shall appoint her daughter to receive the remainder from her annuity, if her daughter be living at the time of her death. If either of said beneficiaries shall not be living at the time of the termination of said trust period, then it is my will that the share or portion of said net proceeds of my said separate trust estate that would have been applied by said trustee in the purchase of a life annuity for said beneficiary shall, in lieu thereof, be paid over to the heirs-at-law in being at the expiration of said trust, per stirpes, said heirs-at-law to be determined in accordance with the laws of the State of Florida with respect to descent distribution.
"It is my understanding that the proceeds from the liquidation of my sister's estate shall be used as directed in her will, but without co-mingling with my estate, and the purchase of annuities by each fund be handled entirely separate and independently, because of the difference in character of the annuity contracts to be purchased.
"I am not unmindful of the fact that my nephew, Daniel C. Morgenthaler, is now deceased. This item of my will provides the method by which his heirs shall receive their portion of my estate."
[3] Each of the petitioners prayed that the court find that they were the "absolute and unqualified owners" of the sums to be used for the purchase of the annuities; and each prayed that the court order the Executor to pay to petitioners the full amount thereof in a lump sum, or, in the alternative, to purchase annuity contracts not only containing no prohibition against "sale, transfer, assignment or other like disposition" but also containing an express provision allowing such disposition. The petition of Joseph E. Morgenthaler, in reference to his power of appointment, also prayed, in his alternative prayer, that any annuity contract purchased "provide for lump sum payment to my appointee."
[4] The common law of England down to this date is by statute, "declared to be of force in this state" where "not inconsistent with the constitution and laws of the United States and the acts of the legislature of this state." Section 2.01, F.S. 1951, F.S.A.
[5] Collocation of the English cases appears in Parker v. Cobe, 208 Mass. 260, 94 N.E. 476, 33 L.R.A.,N.S., 978, 981, 21 Ann.Cas. 1100, 1101.
[6] Parker v. Cobe, supra, note 5.
[7] In re Cole's Estate, 219 N.Y. 435, 114 N.E. 785, Ann.Cas. 1918E, 807; Reid v. Brown, 54 Misc. 481, 106 N.Y.S. 27; In re Bertuch's Will, 225 App.Div. 773, 232 N.Y.S. 36. However, after the New York Courts had declared the common-law rule in force in that state, the Legislature enacted section 47-b of the Decedent Estate Law, McKinney's Consol. Laws, c. 13, to change that rule. See In re Fischer's Estate, 261 App.Div. 252, 25 N.Y.S.2d 140, 142. Section 47-b of the New York Decedent Estate Law now provides in part as follows: "If a person hereafter dying shall direct in his will the purchase of an annuity, the person or persons to whom the income thereof shall be directed to be paid shall not have the right to elect to take the capital sum directed to be used for such purchase in lieu of such annuity except to the extent the will expressly provides for such right, or except to the extent that the will expressly provides that an assignable annuity be purchased."
[8] In re Benziger's Estate, 61 Cal. App.2d 628, 143 P.2d 717; Ketcham v. International Trust Co., 117 Colo. 559, 192 P.2d 426; In re Johnson's Estate, 238 Iowa 1221, 30 N.W.2d 164; Gilbert v. Findlay College, 195 Md. 508, 74 A.2d 36; Bedell v. Colby, 94 N.H. 384, 54 A.2d 161; Berry v. President and Directors of Bank of Manhattan Co., 133 N.J. Eq. 164, 31 A.2d 203; Feiler v. Klein, Ohio App., 74 N.E.2d 384.
[9] Elaborating on this proposition the Maryland Court in Gilbert v. Findlay College, supra note 8, opined [195 Md. 508, 74 A.2d 38]: "The English rule, disregarding the expressed intention of the testator, was based upon the theory that the courts would not compel an executor to perform an act which would be entirely nugatory. Some of the cases stated that when a testator directed an executor to purchase an annuity, he would be presumed to do that with the knowledge that the annuitant could claim the cash principal instead of the annuity. The theory was that if an annuity was purchased for a legatee's benefit, he could then immediately sell his annuity and get the purchase price. Accordingly it would be a useless act for the executor to buy the annuity. Annuities were purchased more frequently in England than in this country, (Williams Case, 3 Bl. 186, 228) and while we must accept the statements made by the English courts that they could there be immediately sold, it is doubtful whether that condition obtains in this country. If it does not, then the reason for the rule does not exist. We have no facts before us on this question, but we do not have to decide, in this case, whether the English law fits our circumstances and conditions, because of the conclusion we have reached that it could not apply to these particular bequests."
[10] See the cases cited supra note 8.
[11] The prayer of the petitions of each of the appellants, see supra note 3, is for an order of the court to compel this action of the executor.
[12] Berry v. President and Directors of Bank of Manhattan Co., op. cit. supra note 8.
[13] See note (1942) 41 Mich.L.Rev. 276, 282.