MAKAR, J.
In this appeal, Pamela Spivey, as personal representative of the estate of her son, Nicklaus Ellison, raises two issues. She claims the trial court erred in (a) granting the motion of Teen Challenge of Florida, Inc., to compel arbitration without holding an additional hearing that she first requested in a motion for reconsideration; and (b) enforcing the arbitration agreement despite her claims it is unenforceable and in violation of her rights under the due process and freedom of religion clauses of the United States and Florida Constitutions. For the reasons below, we affirm.
I.
Teen Challenge operates residential facilities that assist young men in overcoming addiction through the application of biblical principles. On March 2, 2011, Nicklaus — then nineteen years old — enrolled in a year-long program at Teen Challenge’s substance abuse facility in Pensacola, Florida, signing several documents, including the arbitration agreement at issue, which provides in pertinent part:
The undersigned parties accept the Bible as the inspired Word of God. They believe that God desires that they resolve their disputes with one another within the Church and that they be reconciled in their relationships in accordance with the principles stated in First Corinthians 6:1-8, Matthew 5:23-24, and Matthew 18:15-20. Accordingly, the undersigned parties hereby agree that, if any dispute or controversy that arise [sic] out of, or is related to this agreement is not resolved in private meetings between the parties pursuant to Matthew 5:23-24 and 18:15, then the dispute or controversy will be settled by biblically based mediation and, if necessary, legally binding arbitration, in accordance with the Rule[s] of Procedure for Christian Conciliation (rules) of the Association of Christian Conciliation Services (current rules available and incorporated by this reference). The undersigned parties agree that these methods shall be the sole remedy for any dispute of [sic] controversy between them and, to the full extent permitted by applicable law, expressly waive their right to file a lawsuit in any civil court against one another for such disputes, except to enforce an arbitration decision, or to enforce this dispute resolution agreement. Any mediated agreement or arbitrated decision hereunder shall be final and binding, and fully enforceable according to its terms in any court of competent jurisdiction.
Nicklaus also signed a waiver, which stated:
I ... understand that I have civil rights [for] ... exercising the religion of my choice. Teen Challenge is an evangelical Christian discipleship ministry for people with life-controlling problems. As such, I realize and submit to the ministry’s expectations to attend Christian religious activities coordinated by the ministry ... I fully understand my rights and what I am waiving.
On May 28, 2011, approximately two months after Nicklaus had enrolled, he violated program rules. As a result, Ms. Spivey was told by Teen Challenge’s staff that Nicklaus was being “discharged” from the program; Nicklaus was given all his belongings and he left for his mother’s home in Tennessee. Shortly thereafter, he was incarcerated, apparently due to a probation violation in that state. Though facing approximately one year of jail time, he was able — with the help of his mother — to get an agreement with Tennessee authorities that allowed his release so he could give the Teen Challenge program in Florida another try.
*989 Nicklaus then returned to the Pensacola facility, but soon relapsed by obtaining and ingesting over-the-counter cough medicine, a second violation of Teen Challenge’s rules. Rather than be expelled, Nicklaus was transferred in July 2011 to Teen Challenge’s Jacksonville facility, a move Ms. Spivey had requested. Because he was considered an internal transfer from one Teen Challenge facility to another, he was not asked to fill out new paperwork or a new arbitration agreement; the existing arbitration agreement was sent to the Jacksonville facility.
Sadly, Nicklaus’s time at the Jacksonville facility was tumultuous and fleeting. On August 19, 2011, the Jacksonville staff noted that Nicklaus “appeared to be intoxicated upon return from [a] work crew” resulting from ingesting cough syrup he had stolen from a Publix. Due to this third violation, he was dismissed later that day and transported by staff to a local medical center; his dismissal was for thirty days and he was advised to contact Teen Challenge staff within seventy-two hours to discuss possible readmission to the program. He never returned. Instead, he apparently turned to the streets of Jacksonville where he was picked up and taken to a stranger’s residence at which he later died that night from multiple drug toxicity.
On March 19, 2012, Ms. Spivey sued Teen Challenge for wrongful death based on the program’s alleged negligence. Teen Challenge filed a motion to compel mediation/arbitration and to dismiss the complaint pursuant to section 682.03, Florida Statutes, asserting that there was no “substantial issue” precluding arbitration. On July 31, 2012, the trial judge conducted a hearing at which the parties argued their respective legal positions based on the affidavits and discovery responses filed in the case along with their legal memoranda.
In a detailed order, the trial court granted the motion to compel arbitration. The court found the treatment program was ongoing at the time of Nicklaus’s death, under the same terms and conditions the parties agreed to at the signing of the March 2011 agreement, and that Teen Challenge maintained Nicklaus’s enrollment even though he was at times suspended. The trial court also found that the arbitration agreement did not deprive a participant of due process or access to secular law and did not implicate Ms. Spi-vey’s First Amendment rights. Ms. Spi-vey moved for reconsideration, seeking an evidentiary hearing and raising additional grounds for the invalidity of the arbitration agreement. The trial court denied Ms. Spivey’s motion for reconsideration, reconfirming its initial holding that “no substantial issue was raised as to the continued existence of the original Arbitration Agreement from March 2, 2011 through August 19, 2011.” Ms. Spivey timely sought appellate review.
II.
We begin by noting that no issue, substantial or otherwise, exists regarding whether a valid and enforceable religiously-based arbitration agreement was entered between Nicklaus and Teen Challenge at the time he entered the program in March 2011. That said, the two issues we address are: (1) whether the trial court erred in denying Ms. Spivey’s motion for reconsideration, and (2) whether the trial court erred in enforcing the Teen Challenge arbitration agreement despite her personal constitutional objections.
A.
On the first issue, Ms. Spivey claims it was error to deny the request in her motion for reconsideration that an evidentiary hearing be held. The crux of her claim is *990 that a disputed factual issue existed as to whether the arbitration agreement, though valid and enforceable when Nicklaus enrolled, continued to remain in force after he was dismissed from Teen Challenge’s program in Pensacola in May 2011. She says an evidentiary hearing was necessary to show that his dismissal terminated the arbitration agreement and that because Nicklaus signed no new arbitration agreement when he returned to Pensacola and was later transferred to Jacksonville, the trial court should not have ordered arbitration.
Florida arbitration law specifies when a trial court is to grant an application seeking to compel arbitration:
If the court is satisfied that no substantial issue exists as to the making of the agreement or provision, it shall grant the application. If the court shall find that a substantial' issue is raised as to the making of the agreement or provision, it shall summarily hear and determine the issue and, according to its determination, shall grant or deny the application.
§ 682.03(1), Fla. Stat. (emphasis added).[1] This Court and others have acknowledged that this statute requires an expedited hearing be held when a “substantial issue” has been raised regarding the making of an agreement. See Rowe Enters. LLC v. Int'l Sys. & Elec. Corp., 932 So.2d 537 (Fla. 1st DCA 2006); see also FL-Carrollwood Care Ctr., LLC v. Jaramillo, 36 So.3d 180, 182-83 (Fla. 2d DCA 2010); Crystal Motor Car Co. of Hernando, LLC v. Bailey, 24 So.3d 789, 791 (Fla. 5th DCA 2009); Curcio v. Sovereign Healthcare of Boynton Beach L.L.C., 8 So.3d 449, 450 (Fla. 4th DCA 2009); Travelers Ins. Co. v. Irby Constr. Co., Inc., 816 So.2d 829, 830 (Fla. 3d DCA 2002). This interpretation is based on the plain statutory language that the trial court “shall summarily hear” the matter if it finds a “substantial issue is raised as to the making of the agreement or provision” at issue.
At the outset, the trial court held an expedited hearing on Teen Challenge’s motion to compel arbitration, which included consideration of affidavits, legal memos, and argument of counsel, all of which was preceded by discovery. Based on the parties’ submissions and arguments, the trial court concluded that Nicklaus consented to arbitrate under a valid agreement, one that envisioned a twelve-month program in which he was enrolled. As to this temporal aspect of the program, the trial court found that the program appeared to be an “ongoing” one “under the same terms and conditions that the parties agreed to at the time of the signing of the agreement.” It also found that Teen Challenge maintained Nicklaus’s “enrollment even though he was on occasions suspended which apparently is not uncommon in that type of program.” The trial court concluded that Nicklaus “voluntarily consented to being transferred from Pensacola to Jacksonville as part of the same ongoing program.” It also con- *991 eluded that the evidence presented appeared to show that “the intent of the parties was that this agreement would last throughout his enrollment into the Teen Challenge Program which continued by his acquiescence from Pensacola on through to Jacksonville.” These findings, contained in the order compelling arbitration, are supported by the record. Proper v. Don Conolly Constr. Co., Inc., 546 So.2d 758, 759-60 (Fla. 2d DCA 1989) (trial court “properly complied with the requirements of the- statute by summarily hearing the issue” via its review of documents, affidavit, and arguments of counsel).
In her reconsideration motion, Ms.-Spi-vey sought to create a substantial issue, not as to the making of the arbitration agreement, but as to its continued existence following Nicklaus’s suspension, though couching it as “whether there was a valid agreement to arbitrate in place.” For the first time, she sought an evidentia-ry hearing. In response, the trial court reviewed the parties’ supplemental submissions on an expedited basis (without a hearing) and concluded that “there was no substantial issue raised as to the continued existence of the original Arbitration Agreement from March 2, 2011 through August 19, 2011.” Consistent with the goal of prompt resolution of arbitration disputes, the trial court’s accelerated review ensured that Ms. Spivey’s motion could be ruled upon before expiration of the time for her to file an appeal. See Merrill Lynch Pierce Fenner & Smith, Inc. v. Melamed, 425 So.2d 127, 128 (Fla. 4th DCA 1982) (“Speedy resolution of disputes is the raison d’etre of arbitration. Once parties agree to arbitrate, it is essential that they have an easy and quick means to enforce their agreement to arbitrate.”)
We conclude that the trial court’s decision to deny the motion for reconsideration was proper. No substantial issue existed as to the making of the arbitration agreement, such that no evidentiary hearing was required. Nucci v. Storm Football Partners, 82 So.3d 180 (Fla. 2d DCA 2012). The motion for reconsideration sought to create a substantial issue as to the continuation of the original arbitration agreement, a factual determination that could have been left to the arbitrator, Gainesville Health Care Center, Inc. v. Weston, 857 So.2d 278, 288 (Fla. 1st DCA 2003), but which was adjudicated by the trial court without objection from the parties. Even if section 682.03(1) applied to this determination, the trial court’s conclusion that no substantial issue existed is supported by the record. Moreover, under these circumstances — with this degree of judicial attention paid to the parties’ contention on two occasions on an expedited basis followed by detailed written orders — an evidentiary hearing would have served no purpose; the trial court did not err in denying one, and its findings are supported by competent, substantial evidence.
B.
Next, Ms. Spivey contends that judicial enforcement of the arbitration agreement violates her rights under the due process and religion clauses of the United States and Florida Constitutions because the Rules of Procedure for Christian Conciliation are imbued with religious themes and require religious practices. We disagree.
Preliminarily, we note that Ms. Spivey does not argue that constitutional impediments bar the enforceability of the arbitration agreement between Teen Challenge and Nicklaus; indeed, nothing in the record suggests that Nicklaus did anything other than voluntarily agree to be bound by its terms, religious and non-religious *992 alike. That was his decision to make. Ms. Spivey claims independently, however, that her own constitutional rights will be violated if she is required to comply with the Teen Challenge arbitration agreement and its Rules; she does not wish to proceed through an arbitration process .that invokes religious principles and (at léast facially) involves religious acts such as prayer.
But the law requires that Ms. Spi-vey stand in her son’s shoes and that she be bound by his decision, a principle that applies to wrongful death actions. See Laizure v. Avante at Leesburg, Inc., 109 So.3d 752, 762 (Fla.2013), approving, 44 So.3d 1254 (Fla. 5th DCA 2010). Our supreme court made this point unequivocally clear in stating as follows:
the nature of a wrongful death cause of action in Florida is derivative in the context of determining whether a decedent’s estate and heirs are bound by the decedent’s agreement to arbitrate. The estate and heirs stand in the shoes of the decedent for purposes of whether the defendant is liable and are bound by the decedent’s actions and contracts with respect to defenses and releases.
Id. at 762. Based on Laizure, it is likewise clear that Nicklaus’s estate, its personal representative, and its statutory heirs are each bound by the arbitration agreement, particularly in the context of wrongful death, the claim at issue here.
Next, we make two observations. First, we note that “[c]ourts are required to indulge every reasonable presumption in favor of arbitration recognizing it as a favored means of dispute resolution.” Am. Int’l Grp., Inc. v. Cornerstone Bus., Inc., 872.So.2d 333, 338 (Fla. 2d DCA 2004) (citing cases). This presumption extends to private religious arbitration, which is exceedingly common in our pluralistic religious society — most major religious denominations have some method of private dispute resolution within their domains, some going back hundreds of years.[2] As one commentator notes, the “current and continued existence of religious arbitration in the United States is not disputed, as it has been utilized for decades within a variety of religious communities.” Amanda M. Baker, A Higher Authority: Judicial Review of Religious Arbitration, 37 Vt. L.Rev. 157, 157 (2012); see also Michael A. Helfand, Religious Arbitration and the New Multiculturalism: Negotiating Conflicting Legal Orders, 86 N.Y.U. L.Rev. 1231, 1242 (2011) (examining the “deferential treatment U.S. courts afford to religious arbitration awards and the institutional role religious arbitration plays in religious communities.”). Indeed, courts routinely uphold agreements to submit disputes to religious arbitration in the absence of fraud, duress, or corruption. See, e.g., Meshel v. Ohev Sholom Talmud Torah, 869 A.2d 343, 359-64 (D.C.2005) (applying D.C. Uniform Arbitration Act to synagogue, and reversing order dismissing action to compel arbitration before Beth Din); Jabri v. Qaddura, 108 S.W.3d 404, 412-14 (Tex.App.2003) (ordering Islamic arbitration to determine the enforceability *993 of a marriage contract); Encore Prods., Inc. v. Promise Keepers, 53 F.Supp.2d 1101, 1111-13 (D.Colo.1999) (analyzing the Rules of Christian Conciliation under the Federal Arbitration Act, and granting a motion to dismiss on the basis that the parties agreed to arbitrate under the Rules); see also Ainsworth v. Schoen, 606 So.2d 1275, 1276 (Fla. 3d DCA 1992) (reversing summary judgment confirming an arbitration award because it was unclear whether the award was final, but recognizing that the parties “agreed to be bound by Jewish law”).
Second, we note that the arbitration agreement at issue in this case requires compliance with the Rules, which appear to be indistinguishable in almost every respect to those of secular arbitration organizations. The Rules consist of ten pages of single-spaced text covering every major aspect of standard secular mediation and arbitration processes. Boiled down to their essence, the Rules differ from those of secular groups only because of a scattering of religious elements added to solemnize the process and to promote and advance conciliation as a spiritual goal.[3]
In this regard, Ms. Spivey on appeal raises a number of religious objections to the Rules; we address only those that have been preserved. Before doing so, we distinguish Ms. Spivey’s reliance on Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), by noting that ease involved the enforcement of a racially restrictive covenant against third parties who had not agreed to its terms, which contrasts with the arbitration agreement voluntarily entered between Nicklaus and Teen Challenge. This same distinction makes cases involving inmates’ forced participation in religious programs not pertinent. See, e.g., Inouye v. Kemna, 504 F.3d 705 (9th Cir.2007).
Turning back to the specific religious objections, Ms. Spivey first points to Rule 4, which states: “Conciliators [arbitrators] shall take into consideration any state, federal, or local laws that the parties bring to their attention, but the Holy Scripture (the Bible) shall be the supreme authority governing every aspect of the conciliation process.” (Emphasis added). We emphasize the word “process” because nothing in this provision suggests that the Bible is to provide decisive substantive guidance on principles of negligence, wrongful death or the collateral source rule, for examples. On its face, instead, Rule 4 envisions that secular laws are given consideration[4] and that the Bible is to be the authoritative guide for shepherding a case through the arbitration process. That religious precepts will guide the arbitration process does not create a constitutional issue that would preclude enforcement of a voluntary agreement between private parties to arbitrate according to spiritual principles. Nicklaus and Teen Challenge were free to choose, as they did here, a religious process they deemed appropriate to resolve their disputes.[5] Their doing so does not *994 raise a concern that the resolution of their dispute would be inconsistent with any federal or state substantive law.[6] Air Conditioning Equip., Inc. v. Rogers, 551 So.2d 554, 557 (Fla. 4th DCA 1989) (“Once the parties agree to submit to arbitration, the [Florida Arbitration Code] limits the authority of the court to interfere in the process prematurely.”).
Next, Ms. Spivey points to a provision in the Rules providing for prayer as a normal part of the mediation and arbitration process.[7] She argues that, she, as personal representative, should not be forced to engage in a process involving a Christian prayer (even though she is a Christian) because to do so violates principles prohibiting governmentally-coerced religious acts. She asserts that her right to the free exercise of her personal religious beliefs is inalienable and cannot be waived, even in the context of her duties as a personal representative. In effect, she claims the legal right for her personal religious views to nullify and thereby trump the religious arbitration agreement into which Nieklaus and Teen Challenge voluntarily entered.
We note, however, that a personal representative generally cannot object that fulfilling the deceased’s wishes offends the religious sensibilities of the personal representative; personal representatives serve the estate’s interest, not vice-versa. See Kasmer v. Guardianship of Limner, 697 So.2d 220 (Fla. 3d DCA 1997) (personal representative, who objected on religious grounds to cremation, has a duty to administer estate according to decedent’s wishes). This obligation to fulfill the de-ceaseds’ wishes extends to the judiciary. See Morgenthaler v. First Atlantic Nat’l Bank of Daytona Beach, 80 So.2d 446, 452 (Fla.1955) (“There is no higher duty nor greater responsibility on the courts than that of seeing to it, in proper cases, that the will of the dead is honored.”). Because the role of the personal representative is to advance the deceased’s’ expressed desires, those unwilling or unable to fulfill this role must pass along their responsibilities to others. Kasmer, 697 So.2d at 220-21. As the Third District in Kasmer stated: “If the personal representatives cannot act in compliance with the will because of their religious views, they are free to resign or ask the probate court to appoint suitable individuals who can carry out the decedent’s wishes.” Id. at 221, n. 1. Based on this principle, if a decedent desires that his estate go to his synagogue, be used for the printing of Qu’rans, or be distributed only to heirs who believe in Jesus Christ, the role of the personal representative is an agnostic one: to fulfill the decedents’ express wishes. Under the law, Ms. Spivey must make a choice. She can be the personal representative of Nicklaus’s estate, but she cannot simultaneously forestall her duties and thwart the agreement of the deceased based on her personal religious objections.
*995 This dispute, of course, is not over the terms of Nicklaus’s will. Rather, the question is whether Ms. Spivey’s obligation as personal representative is to stand in Nicklaus’s shoes and comply with an arbitration agreement that no one disputes Nicklaus voluntarily entered. As discussed above, the Florida Supreme Court in Laizure, has answered this question in the affirmative: Ms. Spivey is bound by Nicklaus’s decision to enter the Teen Challenge agreement. And it logically follows that she must comply (despite her religious objections) to that agreement or, as in Kasmer, resign and have a replacement appointed as personal representative.
We note that the Rules can be read to make prayer optional because they say that arbitration proceedings “normally include” opening and closing prayer. Whether that is the case does not detract from Ms. Spivey’s fundamental legal obligation to comply with the obligations of a personal representative. That Teen Challenge is willing to interpret its Rules to accommodate Ms. Spivey’s objection (by not requiring her to actively participate in praying) is laudable but does not alter the applicable legal principles.
III.
We find nothing in Florida or federal law suggesting that the trial court’s decision to require arbitration of the wrongful death claim under the Teen Challenge mediation/arbitration agreement and its Rules was other than wholly proper. Indeed, had the trial court determined that the arbitration agreement was unenforceable due to its religious nature, its action “could itself arguably constitute an impermissible entanglement” under religion clause jurisprudence. See Encore, 53 F.Supp.2d at 1113. For the foregoing reasons, we affirm the trial court’s orders compelling mediation/arbitration.
AFFIRMED.
BENTON and RAY, JJ., concur.

. The Florida Arbitration Code was revised substantially in 2013, reflected in Chapter 2013-232, Laws of Florida, which eliminated these two sentences entirely. The new code, entitled the "Revised Florida Arbitration Code,” now provides • that when there is a dispute about whether an enforceable arbitration agreement exists the court shall proceed "summarily to decide the issue.” § 682.03(l)(b) & (2), Fla. Stat. (2013). The revised code "governs an agreement to arbitrate made on or after July 1, 2013.’,’ Id. § 682.013(1). It "does not affect an action or proceeding commenced or right accrued before July 1, 2013”, id. § 682.013(3), though— until 2016 — all parties to an agreement may agree to the revised code; if they do not, their "agreements shall be governed by the applicable law existing at the time the parties entered into the agreement.” Id. § 682.013(2). Thus, disputes such as the one raised here continue to be resolved under the preexisting law.

. See, e.g., Caryn Litt Wolfe, Faith-Based Arbitration: Friend or Foe? An Evaluation of Religious Arbitration Systems and Their Interactions with Secular Courts, 75 Fordham L.Rev. 427, 437-40 (2006) (focusing on the dispute resolution systems of Judaism, Christianity, and Islam); see also Brief of Religious Tribunal Experts as Amici Curiae in Support of Petitioner, Hosanna-Tabor Evangelical Lutheran Church & Sch. v. Equal Emp’t Opportunity Comm'n, — U.S. -, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012) (No. 10-553) (describing the "long religious tradition” of religious organizations having their own dispute resolution tribunals or processes that are "imbued with the unique values and judgments of the belief systems they support and enforce.”).

.Emblematic of this point is the stated purpose of the Rules to “glorify God by helping people to resolve disputes in a conciliatory rather than an adversarial manner” by not only resolving "substantive issues” but also seeking reconciliation for persons who have been "alienated by conflict” in their lives. See Rules of Procedure for Christian Conciliation, ¶ 1.

. Under Rule 38, arbitrators may "request or consider briefs or position papers that set forth the parties’ understanding of the legal, factual, or scriptural issues.”

. Of course, a religious process might want to avoid practices that could run afoul of article I, section 3 of the Florida Constitution ("Religious Freedom”), which provides: "There shall be no law respecting the establishment of religion or prohibiting or penalizing the *994 free exercise thereof. Religious freedom shall not justify practices inconsistent with public morals, peace or safety.”

. We note that arbitration — religious or otherwise — can create tensions in the context of family law (such as child custody), see, e.g., Wolfe, supra note 1, at 447 (discussing issues affecting faith-based arbitration in the family law context), but we are not faced with those types of public policy concerns here.

. Rule 22 provides that a "mediation meeting will normally include: (1) an introduction and opening prayer ... and (9) closing comments and prayer.” Rule 34 provides that arbitration proceedings "shall be conducted according to the same format as mediation proceedings (see Rule 22), except as limited by these Arbitration Rules.”